870 P.2d 260 (1994)
126 Or. App. 689
ST. PAUL FIRE & MARINE INSURANCE COMPANY, INC., and St. Paul Mercury Insurance Company, Inc., Respondents,
v.
McCORMICK & BAXTER CREOSOTING CO., Appellant,
National Continental Insurance Company, successor to American Star Insurance Company by change of name; Consolidated American Insurance Company; Hartford Accident & Indemnity Company; Certain Underwriters at Lloyd's, London; United States Fire Insurance Company; Continental Casualty Company; Gulf Insurance Company, Respondents, and
Boston Insurance Company; Mission Insurance Company (in liquidation); Mission National Insurance Company (in liquidation); National Union Fire Insurance Company of Pittsburgh, Pennsylvania; Scottsdale Insurance Company, Defendants.
McCORMICK & BAXTER CREOSOTING CO., Cross-ComplainantAppellant,
v.
ST. PAUL FIRE & MARINE INSURANCE COMPANY, INC., and St. Paul Mercury Insurance Company, Inc., National Continental Insurance Company, successor to American Star Insurance Company by change of name; Consolidated American Insurance Company; Hartford Accident & Indemnity Company; Certain Underwriters at Lloyd's, London; United States Fire Insurance Company; Continental Casualty Company; Gulf Insurance Company; National Fire Insurance Company of Hartford, Cross-DefendantsRespondents, and
Boston Insurance Company; Mission Insurance Company (in liquidation); Mission National Insurance Company (in liquidation), Cross-Defendants.
A8711-07096; CA A71072.
Court of Appeals of Oregon.
Argued and Submitted December 23, 1992.
Decided March 9, 1994.
*261 Barry S. Levin, San Francisco, California, argued the cause for appellant. With him on the briefs were Celia M. Jackson and Susan M. Leberman, San Francisco, California, Paul R. Gary, G. Frank Hammond and Heller, Ehrman, White & McAuliffe, Portland.
Peter R. Chamberlain, Portland, argued the cause for respondent Hartford Acc. & Indem. Co. With him on the brief were Barry M. Mount, Richard A. Lee and Bodyfelt Mount Stroup & Chamberlain, Portland.
David M. Jacobi, Seattle, WA, argued the cause for respondents U.S. Fire Ins. Co., Consol. American Ins. Co., Nat. Continental Ins. Co. and Gulf Ins. Co. With him on the brief for respondent U.S. Fire Ins. Co. were Janet E. McKinnon and Wilson, Smith, Cochran & Dickerson, Seattle, WA, George M. McKallip and Kennedy, King & Zimmer, Portland, for respondent Consol. American Ins. Co. and Nat. Ins. Co., and Mildred J. Carmack, Jay T. Waldon, David E. Prange and Schwabe, Williamson & Wyatt, Portland, for respondent Gulf Ins. Co.
Thomas A. Gordon, Portland, argued the cause for cross-defendantsrespondents St. Paul Fire & Marine Ins. Co., Inc., and St. Paul Mercury Ins. Co., Inc. James T. Waldron, Portland, argued the cause for cross-defendantsrespondents *262 Continental Casualty Company, Gulf Ins. Co., Certain Underwriters at Lloyd's, London, and National Fire Ins. Co. of Hartford. On the brief were I. Franklin Hunsaker, Thomas A. Gordon, Roger Westendorf and Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, and Jeffrey L. Fillerup, Robin Craig-Olson and Adams, Duque & Hazeltine, San Francisco, CA, for cross-defendantsrespondents St. Paul Fire & Marine Ins. Co., Inc., and St. Paul Mercury Ins. Co., Inc.; George W. McKallip, Garr M. King and Kennedy, King & Zimmer, Portland, for cross-defendantsrespondents Nat. Continental Ins. Co. and Consolidated American Ins. Co.; Paul D. Nelson, Michael A. Gevertz and Hancock, Rothert & Bunshoft, San Francisco, CA, and F. Scott Farleigh, Karen S. Stayer and Farleigh, Wada & Witt, Portland, for cross-defendantrespondent Certain Underwriters at Lloyd's, London; Barry M. Mount, Peter R. Chamberlain, Richard A. Lee and Bodyfelt Mount, Stroup & Chamberlain, Portland, for cross-defendantrespondent Hartford Acc. and Indem. Co.; David J. Jacobi and Wilson, Smith, Cochran & Dickerson, Seattle, WA, for cross-defendantrespondent U.S. Fire Ins. Co.; and Mildred J. Carmack; David E. Prange, James T. Waldron and Schwabe, Williamson & Wyatt, Portland, for cross-defendantsrespondents Continental Cas. Co., Certain Underwriters at Lloyd's Subscribing to Certificate No. 10010 and National Fire Ins. Co. of Hartford.
Rick T. Haselton and Lindsay, Hart, Neil & Weigler, Portland, filed a brief amicus curiae for Associated Oregon Industries.
Jeffrey V. Hill, Bradford H. Lamb and Zarosinski & Hill, Portland, filed a brief amicus curiae for Aetna Cas. & Sur. Co.
Before ROSSMAN, P.J., and De MUNIZ and LEESON,[*] JJ.
De MUNIZ, Judge.
Plaintiffs and cross-defendants St. Paul Fire & Marine Insurance Company, Inc., and St. Paul Mercury Insurance Company, Inc. (St. Paul), brought this declaratory judgment action against their insured McCormick & Baxter (M & B). St. Paul sought a declaration that there is no coverage under St Paul's liability insurance contracts for costs incurred by M & B in investigating and correcting environmental contamination resulting from its operations in Oregon and California. St. Paul included as defendants the insurance companies that had issued liability insurance contracts to M & B, seeking a declaration that, if coverage does exist under St. Paul's contracts, it also exists under the insurance contracts issued by those companies. M & B then filed a cross-complaint against all of the insurance companies[1] seeking damages for breach of contract and a declaration that the companies have a duty to defend M & B in environmental administrative proceedings and to indemnify it for its environmental cleanup costs.[2]
On two different sets of motions for summary judgment, the court held that M & B did not have coverage. The trial court granted summary judgment to St. Paul, Continental Casualty Company (Continental), National Continental Insurance Company (National Continental), National Fire Insurance Company of Hartford (National Fire) and Certain Underwriters at Lloyd's, London (Lloyds), the insurers that had insured M & B from 1949 through 1970, on the ground that the damage had not manifested itself until after the period of coverage. The court granted summary judgment to Hartford Accident & Indemnity Company (Hartford), St. Paul and National Fire on the ground that, under policies issued in the 1950's, no "accident" took place as required by the contracts. The court granted summary judgment to Consolidated American Insurance Company (Consolidated), Gulf Insurance Company (Gulf), and United States Fire Insurance Company (U.S. Fire), the insurers that had issued policies to M & B from *263 1970 through 1985,[3] on the ground that the policies contained pollution exclusions that barred coverage. The court also held that, as to the Stockton, California, site, Oregon law applied.
The effect of the court's rulings is that M & B had no insurance coverage for continuous environmental damage until the damage became manifest, but by that time, changes in policy language excluded any coverage for such damage. M & B challenges those rulings. We affirm in part and reverse in part.
M & B has operated wood treatment plants continuously since 1942 in Stockton and since 1945 in Portland. For almost the entire period of the company's operation, M & B purchased standard form comprehensive general liability insurance policies from a series of insurance companies. M & B treats a variety of products, including utility poles, railroad ties, marine pilings and dimensional lumber. The treatment includes use of pentachlorophenol, creosote and heavy metal salts, including arsenic, chromium and copper. As a result of its operations at both facilities, chemicals have leached into the soil and contaminated the soil and groundwater.
Much of the damage was caused by leaching from "surface impoundments," which were uncovered pits that stored the waste. M & B used surface impoundments from 1967 to 1971 in Portland and from 1942 to 1978 in Stockton. Surface impoundments were standard in the industry and were believed to hold the waste and permit liquids to evaporate over time. In the late 1970's, it was learned that, within a year after the initial use of surface impoundments, contaminants leached from them through layers of soil and into the groundwater.
There was additional damage at the Portland facility, caused by overflow from storage tanks, equipment failures, including ruptured pipes and broken valves, and storm runoff from products and equipment that were coated with preservatives. Additionally, during all phases of the operations, the preservatives dripped and spilled onto unprotected soil. There was evidence that damage had occurred in every year from 1942 to 1986.
In 1974, M & B began working with the California Regional Water Quality Control Board to develop a plan for treatment of waste water at the Stockton site. In 1978, M & B agreed to a Consent Order requiring cleanup and abatement. After an inspection of the Stockton plant in 1983, the California Department of Health Services found that M & B had violated the California Hazardous Waste Control Act. Those agencies indicated that M & B would face civil and criminal penalties if it did not clean up the contaminated soil and groundwater. M & B agreed to do so in a July, 1984, Consent Decree.
In 1983, M & B notified the Oregon Department of Environmental Quality (DEQ) that there was soil and groundwater contamination at the Portland site. DEQ and M & B met on a regular basis and, in 1987, they executed a Consent Decree under which M & B was to clean up the contamination. In 1988, after paying over $2,000,000 in investigation and cleanup costs, M & B filed a Chapter 11 bankruptcy proceeding. In 1990, the bankruptcy court approved a reorganization plan under which M & B remained responsible for cleaning up its California and Oregon facilities.
Our review of a summary judgment is to determine whether the moving party has met its burden to show that there are no material issues of fact and that the moving party is entitled to judgment as a matter of law. Seeborg v. General Motors Corporation, 284 Or. 695, 588 P.2d 1100 (1978). We first address the argument by M & B that the trial court erred in holding that Oregon, not California, law applies to the Stockton site. It contends that Oregon has little or no interest in whether M & B receives insurance proceeds to pay for the cleanup at Stockton and that none of the carriers is an Oregon corporation. It contends that California, by contrast, has an enormous interest in having the site cleaned and the insurance proceeds represent the most valuable asset available to fund the cleanup.
We find no error in the court's ruling. We agree with insurers that the location of the particular risk is not controlling. M & B is *264 an Oregon corporation; its principal place of business is in Portland, and most, if not all, of the insurance policies were issued to M & B by its Oregon insurance broker and were countersigned in Portland. Although California has a substantial interest in the environmental cleanup, Oregon has a substantial interest in the regulation of insurance contracts and in determining the rights and liabilities of the parties who enter into those contracts in Oregon. Oregon has an important, fundamental interest in the transaction that clearly is not less important than California's interest. The public policy of Oregon should prevail. Lilienthal v. Kaufman, 239 Or. 1, 395 P.2d 543 (1964); Straight Grain Builders v. Track N' Trail, 93 Or.App. 86, 760 P.2d 1350, rev. den. 307 Or. 246, 767 P.2d 76 (1988).
M & B also assigns as error[4] the trial court's ruling on the "trigger of coverage" issue, the event that must occur during the policy period for there to be coverage. M & B contends that the applicable theory is the "continuous trigger," i.e., that coverage begins when damage occurs. The court rejected that interpretation. It concluded that the environmental injury was cumulative but did not manifest itself until 1978 in Stockton and until 1983 in Portland. It held that M & B could not prove the extent of the injury for each of the years from 1942 to 1986 or the relative portion of cumulative injury attributable to each of the prior years. It decided that the "practical solution" was the "manifestation trigger" theory adopted in Mraz v. Canadian Universal Ins. Co., Ltd., 804 F.2d 1325 (4th Cir.1986), which holds that the damage occurs when it manifests itself. The trial court concluded that, because the damage here did not manifest itself until after expiration of the policies, there was no coverage.
With some variation, the policies issued by St. Paul, National Continental, Lloyd's and Continental provide:[5]
"[The insurer agrees to] pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of * * * property damage * * * caused by an occurrence."
An "occurrence" generally is defined (with the exception of the National Continental policies, which contain no definition of "occurrence") as
"an accident, or * * * continued or repeated exposure to conditions which result in * * * injury to or destruction of tangible property * * * during the policy period."
Interpretation of an insurance policy is a question of law. Hoffman Construction Co. v. Fred S. James & Co., 313 Or. 464, 469, 836 P.2d 703 (1992). In Hoffman, the Supreme Court outlined the methodology by which such a policy is to be construed. The primary, underlying rule is to ascertain the intention of the parties. If a term is not defined, the court resorts to "aids to interpretation" of the parties' intentions. First, the court attempts to determine the plain meaning. If, however, the term is susceptible to more than one plausible interpretation, the court determines which meaning is the more reasonable one by looking first to the specific context in which the term is used, in light of the other provisions of the policy. Only if both of the proposed interpretations remain reasonable does the court resort to the rule of construction that ambiguities are construed against the drafter. 313 Or. at 474, 836 P.2d 703.
Our analysis of the trigger of coverage issue does not require going beyond the plain meaning of the policies, which provide for damages for injury or destruction of property during the policy period. The policies do not make damages dependent on a time of discovery. Insurers argue, however, that the manifestation theory is the only reasonable *265 one, because M & B's interpretation ignores that the policies limit coverage to "occurrences" or "accidents"[6] that result in property damage during the policy period. Their argument is not that the terms of the policy are ambiguous but, rather, that there is no property damage unless it is known.[7] However, insurers point to no language in the policies that says that damage comes into existence at the time that it becomes known. Their interpretation would require us to go outside the text of the policy, and we do not conclude that the ordinary purchaser of insurance would understand "damages" to have the philosophic underpinnings urged by insurers.
Insurers also argue that the trial court's adoption of the manifestation trigger theory is supported by Silver Eagle Co. v. Nat. Union Fire, 246 Or. 398, 423 P.2d 944 (1967), and State Bd. of Higher Ed. v. NW Pac. Indemnity Co., 69 Or.App. 456, 685 P.2d 1026 (1984). In both, a wrongful act during the policy period had allegedly caused a latent defect that manifested itself and caused damage after the end of the policy period. In both cases, the courts held there was no coverage, because the policy was no longer in force when the loss was suffered as a result of the latent defect.
We do not agree that the cases relied on by insurers apply. As insurers themselves state, those cases hold that, "for purposes of liability coverage, property damage occurs at the time of actual damage, not the time of the insured's wrongful act." That is not the same thing as holding that only damage that is "known" exists. Here, there was evidence of actual damage within a year after chemicals were put into the surface impoundments. That is damage during the policy period.
Insurers argue that, nonetheless, M & B will not be able to prove that it sustained a loss by reason of damage to property during each of the policy periods. See Trans. Equip. Rentals v. Ore. Auto. Ins., 257 Or. 288, 296, 478 P.2d 620 (1970). The trial court agreed with insurers that M & B would not be able to apportion damage and that that basis required adopting the manifest trigger theory. However, as M & B points out, no party moved for summary judgment on that ground.[8] Further, the record shows that there was property damage during each period. The apportionment of liability is a separate issue from the trigger of coverage issue and, on this record, cannot be resolved on summary judgment. See Reed v. Jackson County, 105 Or.App. 24, 803 P.2d 1194 (1990), rev. den. 311 Or. 261, 808 P.2d 1015 (1991).
Under the plain language, all that is required to trigger coverage is damage to property during the policy period. The trial court erred in granting summary judgment to St. Paul, Continental, National Continental, National Fire and Lloyd's on the ground that the property damage did not manifest itself until after expiration of the policies.
Insurers argue that the summary judgment can be affirmed on alternative grounds that were argued to the trial court. They first argue that the policies are "third-party" liability policies that expressly exclude *266 coverage for damage to property owned by M & B. However, M & B seeks coverage for remediation of damage to the groundwater, soil and surface water. Groundwater and surface water is property, and M & B does not own the water.[9]Lane Electric Coop. v. Federated Rural Electric, 114 Or.App. 156, 834 P.2d 502, rev. den. 314 Or. 727, 843 P.2d 454 (1992).[10]
St. Paul, National Fire, National Continental and Hartford next contend that they had no duty to defend M & B, because their policies provide for defense of "any suit against the insured," and there has been no "suit" for recovery of cleanup costs. Their position is that the duty to defend depends on initiation of a formal proceeding in a court of law and that the Oregon or California agency proceedings do not amount to that action. They contend that their duty to defend is not triggered whenever an insured decides to take steps to avoid a possible suit in the future.
In School Dist. No. 1 v. Mission Ins. Co., 58 Or.App. 692, 650 P.2d 929 (1982), rev. den. 294 Or. 682, 662 P.2d 725 (1983), the policy, as is the case here, provided that the insurer had a duty to defend a " `suit * * * seeking damages' " and to pay " `all sums which the insured shall become legally obligated to pay.'" 58 Or.App. at 703, 650 P.2d 929. We rejected the argument that "suit" does not include administrative proceedings. Insurers contend that the "methodology" of that decision is suspect after Hoffman Construction Co. v. Fred S. James & Co., supra. We do not agree. We sought to ascertain the intent of the parties, and we considered that "suit" was subject to more than one interpretation. After doing so, we arrived at the conclusion that "suit" was sufficiently broad to cover administrative proceedings. We adhere to that conclusion under the policy language here.
Insurers argue, however, that School Dist No. 1 v. Mission Ins. Co., supra, does not hold that "a communication from an administrative agency raising the possibility of a formal proceeding in the future is a `suit.'" That cuts too fine a distinction. As we noted:
"The duty to defend an insured under an insurance policy is broader than the duty to pay. The duty to defend arises whenever there is a possibility that the policy provides coverage for the claim made." 58 Or.App. at 696, 650 P.2d 929.
Assuming that there are administrative actions that do not obligate the insurers to respond, we agree with M & B that this is not such an instance. Under the statutes governing cleanup of environmental damage, M & B was going to have to pay.[11] The fact that it chose to try to gain a more favorable resolution by cooperation instead of litigation does not mean that the agency was not making a claim that M & B was responsible for damages.
St. Paul, National Fire, National Continental, Lloyd's, Hartford and Continental Casualty also argue that they are not liable, because the costs of cleanup are not "damages" within the meaning of the policies. "Damages" is not defined in the policies. Insurers contend that damages mean "money awarded by courts to those who have suffered loss caused by another." They assert that cleanup costs are not damages, because they are largely costs to prevent future harm, and thus, "damages" in the context of a consent decree are "equitable" and not the "legal" damages intended to be covered by the policy. M & B, in turn, points to dictionary definitions that broadly define "damages," *267 without legal distinctions between law and equity.
In Lane Electric Coop. v. Federated Rural Electric, supra, the issue was whether the insurer had breached its obligation to provide coverage for the plaintiff's pollution cleanup costs, and the defendant argued that those costs were not "property damages." We noted the split in jurisdictions as to whether such expenses were "equitable" in nature and, therefore, not damages. 114 Or.App. at 160 n. 3, 834 P.2d 502. However, we did not base our decision on that distinction. Rather, we concluded:
"Ground water is tangible property. When it is contaminated, its quality is injured physically and is `damaged.' We hold that * * * the contamination of ground water was `property damage.'" 114 Or.App. at 160, 834 P.2d 502. That reasoning applies here. The fact that consent decrees require that costs must be expended for environmental cleanup does not change the fact that those costs resulted because of damage to property.
M & B's second assignment of error is that the trial court erred in granting summary judgment to Hartford, National Fire and St. Paul on the meaning of "accident."[12] The trial court granted insurers' motions for summary judgment on a "few of the policies issued in the 1950's [which] premise liability on an `accident.'" However, it also ruled that there were issues of fact as to the existence and terms of certain of those policies. Because of the trial court's ruling on the trigger of coverage issue, its rulings on the existence and terms of the various policies were moot. Because we reverse on the trigger of coverage issue, those issues of fact remain, but apart from the Hartford policy, we are unable to ascertain which policies present those issues and which policies are affected by our holding on this issue.[13] The policy issues must be resolved on remand.
Our discussion of "accident" is based on the Hartford policy in evidence.[14] That policy obligates Hartford to
"[p]ay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law, or assumed by him under contract as defined in the policy for damages because of injuries to or destruction of property, including loss of use thereof, caused by accident."
The policy does not define "accident." The trial court held that "accidents" have "a temporal element requiring that the happening be at a definite or fixed instant in time." It recognized that it was adopting the minority view but concluded that that definition was supported by the history of the policies and Endorsement 3 to the policy.
M & B's position is that "accident" is not limited to events that are identifiable at fixed instances in time. Rather, it argues that, under Oregon law, accident means an unexpected or unintended event. Ramco, Inc. v. Pacific Ins., 249 Or. 666, 671, 439 P.2d 1002 (1968); see also Finley v. Prudential Ins. Co., 236 Or. 235, 388 P.2d 21 (1963). Accordingly, M & B contends, "accident" is virtually synonymous with "occurrence" and insures against unintended injury caused by exposure to pollutants over an extended period of time.
Hartford argues that "accident" is not synonymous with "occurrence." It contends that, to distinguish the terms, accident must be defined as more than just unexpected or unusual and includes a sudden or instantaneous happening that can be referred to a definite, fixed period of time. In support *268 of its interpretation that the terms are not synonymous, it points to Endorsement 3, which provides, in part:
"The words caused by accident are deleted from Insuring AgreementCoverages A and BBodily Injury Liability of the policy. Insofar as concerns bodily injury liability only, the word `occurrence' is substituted for the word `accident' wherever the latter appears in the policy. (2) Nothing herein contained shall operate to increase the limits of the Company's liability as stated in item 3. Coverages A and B of the Declarations of the policy, it being agreed that any number of bodily injuries or deaths or cases of sickness or disease which result from a common cause or exposure to substantially the same general conditions shall be deemed to result from one occurrence."
By its express terms, the endorsement applies only to coverage for bodily injury and not property damage, for which "accident" remains the operative word. Insurers argue, however, that the endorsement shows that M & B and Hartford "made a conscious business decision that property damage claims would continue to be driven by an `accident' concept." According to Hartford's reasoning, if property damage were also to include "occurrence," the endorsement would be meaningless.
We do not agree with Hartford's interpretation. When the endorsement is read in relation to the policy as a whole, the only reasonable interpretation is that the endorsement to bodily injury relates only to itself. Nonetheless, we conclude that "accident" does not apply to the damage here.
M & B does not cite policy language to support its interpretation that "accident" does not require a temporal element. It primarily relies on Finley v. Prudential Ins. Co., supra, 236 Or. at 245, 388 P.2d 21, where the court stated that an "`accident' denotes an incident or occurrence that happened by chance, without design and contrary to intention and expectation." See also Ramco, Inc. v. Pacific Ins., supra. However, in Finley v. Prudential Ins. Co., supra, 236 Or. at 245, 388 P.2d 21, the court tempered the definition cited by M & B:
"This court is committed by Buckles [Exec.] v. Continental Casualty Co., [197 Or. 128, 251 P.2d 476, 252 P.2d 184 (1953) ] to the rule which distinguishes between accidental means and accidental results from intended means. This rule, as thus adopted, was expressed in the following language in Caldwell v. Travelers Ins. Co., 305 Mo 619, 267 SW 907, 39 ALR 56: "`Where an unusual or unexpected result occurs by reason of the doing by insured of an intentional act, where no mischance, slip or mishap occurs in doing the act itself, the ensuing injury or death is not caused through accidental means; that it must appear that the means used was accidental, and it is not enough that the result may be unusual, unexpected, or unforeseen.'"
Under the rule adopted by the Supreme Court, there is no "accident" if an intentional act brings an unexpected result. That rule applies here to the pollution that resulted from the routine business practices of M & B.
M & B argues that there are triable issues of fact as to whether damage at the Portland site was accidental. However, we agree with Hartford that the evidence did not show such accidents during its policy years. The engineering firm hired to oversee the cleanup at Portland concluded that the only potential source of contamination was the tank farm.[15] The report concluded:
"It is believed that the contamination is directly attributable to using oil as a soil stabilizer in preparing to construct the tanks and to past practices associated with spillage within the tank farm."
That evidence shows intentional practices in the regular course of business, not an "accident." M & B argues, however, that there was evidence of a major spill during a labor dispute when someone opened a flange bolt on a storage tank resulting in a loss of *269 nearly 50,000 gallons of solution. Hartford counters that that evidence did not meet the requirements of ORCP 47 D that "affidavits shall be made on personal knowledge" and "shall set forth such facts as would be admissible in evidence * * *." Hartford is correct. The affidavits relied on by M & B do not demonstrate that the affiants had personal knowledge of the event. M & B failed to show that there were issues of fact as to whether there were "accidental spills" at either site. The trial court did not err in granting summary judgment to Hartford on the issue of "accident."
M & B's third assignment of error is that the trial court erred in granting summary judgment to Consolidated, National Continental, Gulf and U.S. Fire, the insurers that had issued policies to M & B from 1970 through 1985. The trial court held that the pollution exclusions in the policies applied to preclude liability.
The exclusions in the policies issued by Consolidated, National Continental and Gulf provide that there is no coverage for
"Bodily Injury or Property Damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, alkalis, toxic chemical, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water * * *."
The exception to that exclusion restores coverage if
"such discharge, dispersal, release or escape is sudden and accidental."
In Transamerica Ins. Co. v. Sunnes, 77 Or.App. 136, 711 P.2d 212 (1985), rev. den. 301 Or. 76, 717 P.2d 631 (1986), and Mays v. Transamerica Ins. Co., 103 Or.App. 578, 799 P.2d 653 (1990), rev. den. 311 Or. 150, 806 P.2d 128 (1991), we held that identical policy provisions did not provide coverage for damages resulting from ordinary business practices. We noted that the exclusion consisted of two components and that coverage depends on the nature of the discharge, not the nature of the damage:
"The fact that the damage was not intended * * * has nothing to do with whether the discharge was `sudden and accidental' for the purpose of applying the exception to the exclusion." Transamerica Ins. Co. v. Sunnes, supra, 77 Or.App. at 140, 711 P.2d 212. (Emphasis in original.)
M & B argues, however, that we should "reject" our previous rulings and find that "sudden and accidental" is ambiguous and should be interpreted in its favor. We are not persuaded by M & B's arguments and adhere to our earlier opinions.
The policy issued by U.S. Fire does not contain a standard "sudden and accidental" pollution exclusion. However, we agree with U.S. Fire that its policy language unambiguously excludes coverage for liability arising from gradual soil and groundwater contamination.[16] M & B argues that "accidents" are not excluded. However, the record on the pollution exclusion motions shows business practices, not "accidents," during the policy periods. The court did not err in granting summary judgment to U.S. Fire.
Reversed and remanded as to St. Paul Fire & Marine Insurance Company, Inc., St. Paul Mercury Insurance Company, Inc., National Continental Insurance Company, National Fire Insurance Company of Hartford, *270 Certain Underwriters at Lloyd's, London, and Continental Casualty Company on "trigger of coverage" issue; reversed and remanded as to National Fire Insurance Company of Hartford and St. Paul Fire & Marine Insurance Company, Inc., on "accident" issue; otherwise affirmed.
NOTES
[*] Leeson, J., vice Buttler, J., retired.
[1] In each assignment of error, we delineate which insurers are involved in the issue. However, for ease of reading we refer to "insurers" unless particularization is required.
[2] The magnitude of the claims is in excess of $20,000,000.
[3] Beginning in 1985, insurers began issuing policies with absolute pollution exclusions.
[4] Hartford did not seek summary judgment on the issues involved in M & B's first and third assignments of error. It adopts the alternative arguments made by St. Paul. The other insurers involved in the first assignment of error join in St. Paul's arguments.
[5] The National and certain of the St. Paul and Hartford policies are missing. The trial court held that there were issues of fact as to the existence, terms and parties for certain policies. However, those issues of fact were mooted by its ruling that the damage did not occur until it was manifest.
[6] "Accident" and "occurrence" are discussed in the second assignment of error, infra.
[7] The insurers offer an anthropocentric argument:

"Property damage is a purely economic concept; property has value only to the extent humans give it value. There can be no claim for property damage until the property's value has been affected by the knowledge that something has happened to that property."
[8] The trial court stated that M & B had "conceded in oral argument that it would be impossible to prove the extent of the injury for each of the years * * *." On appeal, M & B states that it does not concede that it is impossible to allocate damage over successive policy periods. We do not read as a concession M & B's counsel's statement during colloquy that

"unless there's something in the policy which says I have to prove precisely how much [damage], we don't think such a limitation or requirement should be read in because it may well effectively deprive us of any coverage."
Although M & B contends that allocation is unwarranted under both the language of the policies and existing law, it does not ask for determination of the issue. As we have previously noted, summary judgment cannot be used to cut off a litigant's right to present evidence at trial if there is no showing that there is no issue of fact at the time of the motion. See Harbert v. Riverplace Associates, 114 Or.App. 80, 83, 834 P.2d 476 (1992).
[9] ORS 537.110 provides that "[a]ll water within the state from all sources of water supply belongs to the public."
[10] Insurers argue that, with the possible exception of groundwater pollution, there was no evidence of damage to the property of third parties. They contend, therefore, that they were entitled to a declaration that they had no liability for the cost to M & B of repairing or cleaning up its own property, such as the soil. That would be so if the pollution to the soil is not inextricably linked to the pollution of the groundwater, for example having to clean the soil to prevent pollution to the water filtering through the soil. Whether such facts exist cannot be resolved on summary judgment.
[11] See ORS 465.225; Cal.Health & Safety Code § 25363(d).
[12] Hartford has filed a brief addressing this assignment of error, in which National Fire and St. Paul join.
[13] M & B asserts that only the Hartford policy in effect from 1950 to 1951 is not in dispute. However, Hartford contends that M & B admitted that three missing policies issued between September 1, 1949, and September 1, 1953, are identical to the one policy submitted into evidence. National Fire argues that M & B has taken the position that, if the National Fire policies were issued, they would have provided coverage on an "accident" basis like the policies issued by Hartford. St. Paul asserts that it provided coverage like the Hartford policy.
[14] The policies discussed in the "trigger of coverage" issue defined "occurrence" as an accident or continued or repeated exposure.
[15] The engineer with primary responsibility for the remedial action plan for the Stockton facility concluded that the only source of the Stockton contamination, of any measurable consequence, was the waste dumped into the ponds during the regular course of business.
[16] The policy provides for loss caused by an occurrence that "means either an accident * * * or a continuous or repeated exposure to conditions * * *." However, the policy contains a "Contamination and Pollution Exclusion" that changed the "occurrence" definition with respect to coverage for pollution:

"CONTAMINATION AND POLLUTION EXCLUSION
"This policy shall not apply under Coverage 1(a) and 1(b) to liability for contamination or pollution of land, water, air or real and personal property or any injuries or damages resulting therefrom caused by an occurrence.
"For the purpose of this endorsement, Condition D(d) of the policy [the occurrence definition] is deleted and replaced by the following:
"With respect to Coverage 1(a) and 1(b) `Occurrence' means a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to persons or tangible property during the policy period. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence."