INTERSTATE FIRE & CASUALTY COMPANY, an Illinois corporation, Plaintiff–Appellant,

v.

ARCHDIOCESE OF PORTLAND IN OREGON, an Oregon corporation; Underwriters at Lloyd's of London, et al., subscribing to policies numbered SL 3391/SLC 5411 and SL 3831/SLC 5843; Excess Insurance Co., Ltd., a United Kingdom corporation; Yasuda Fire and Marine Insurance Company, (U.K.), a United Kingdom corporation; Terra Nova Ins. Co., Ltd., a United Kingdom corporation, et al., Defendants–Appellees.

No. 91–35610.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 6, 1993.

Withdrawn from Submission April 1, 1993.

Resubmitted Aug. 11, 1994.

Decided Aug. 30, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 19, 1994.

G. Marts Acker and William D. Okrent, Acker & Okrent, Portland, OR, and Timothy J. McNamara, Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, LA, for plaintiff-appellant Interstate Fire & Cas. Co.

John R. Faust, Jr., and Mildred J. Carmack, Schwabe, Williamson & Wyatt, Portland, OR, for defendant-appellee Archdiocese of Portland.

Richard F. Johnson, Hugh C. Griffith, and Sandra K. Macauley, Lord, Bissell & Brook, Chicago, IL, and Jeffrey M. Batchelor and Milo Petranovich, Lane, Powell, Spears & Lubersky, Portland, OR, for defendants-appellees LLoyd's, et al.

Before: D.W. NELSON, TROTT, and T.G. NELSON, Circuit Judges.

D.W. NELSON, Circuit Judge:

Interstate Fire & Casualty Company ("Interstate") appeals the district court's grant of summary judgment in favor of the Archdiocese of Portland in Oregon and Underwriters at Lloyd's of London, et al. ("Lloyd's") in an insurance coverage dispute. In 1985, the Archdiocese was sued by a boy who claimed that he had been sexually molested over a period of years by a priest employed by the Archdiocese. The parties to the underlying molestation action eventually settled the claim with contributions from the Archdiocese, its primary insurer, Lloyd's, and its excess insurer, Interstate. Interstate subsequently brought this diversity action in federal district court, claiming that, under the terms of the applicable policies, the entire loss should be carried by the Archdiocese and Lloyd's, and that it should be reimbursed for the funds that it had contributed to the settlement. The parties each submitted motions for summary judgment, and the district court ruled in favor of the Archdiocese and Lloyd's. We have jurisdiction pursuant to 28

U.S.C. § 1291. We reverse the grant of summary judgment and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Father Laughlin, a priest employed by the Archdiocese of Portland, sexually molested children for many years. The Archdiocese received reports of Father Laughlin's conduct in 1979 and in every subsequent year until Father Laughlin was arrested in 1983. After his arrest, Father Laughlin pleaded guilty to charges of sexually abusing children, and was imprisoned.

In 1985, Fred Grgich, who claimed to have been molested by Father Laughlin on numerous occasions between 1974 and 1983, brought an action against the Archdiocese for damages. The parties in the underlying action eventually settled the claim for $500,000. The parties to the present coverage dispute agree that the Archdiocese was negligent from approximately July 15, 1979, through June 1983, for failing to supervise Father Laughlin properly or remove him from his position, and that Father Laughlin had serious sexual contact with Grgich in each of those four years. The parties also agree that $500,000 was a reasonable settlement sum. At issue in this appeal are the rights and responsibilities of the parties with respect to payment of the settlement and associated costs.

Between July 1, 1979, and July 1, 1983, the Archdiocese was insured by Lloyd's and Interstate. The Lloyd's policy provided a first layer of coverage, but required the Archdiocese to maintain a self-insured retention ("SIR"), and required that the SIR be exhausted before Lloyd's coverage would be triggered.[1] Interstate's policy was excess to both the Lloyd's policy and the Archdiocese's SIR, and, as such, would be triggered only if payment of a claim were to exceed the amount of all of the underlying coverage. Interstate's policies were "following form" policies, and incorporated by reference the relevant terms of the underlying Lloyd's policy. The policies were occurrence policies, with coverage capped on a per occurrence basis. Under such policies, the date of the occurrence, rather than the date of the claim, determines coverage.

The Archdiocese's coverage in the relevant years was as follows:

| | SIR | Lloyd's | Interstate |
|---|---|---|---|
| July 1, 1979—July 1, 1980: | $75,000 | $125,000 | $4,800,000 |
| July 1, 1980—July 1, 1981: | $75,000 | $125,000 | $4,800,000 |
| July 1, 1981—July 1, 1982: | $100,000 | $100,000 | $4,800,000 |
| July 1, 1982—July 1, 1983: | $100,000 | $100,000 | $4,800,000 |

The Grgich settlement was funded as follows:

$50,000 from Father Laughlin;

$74,997 from the Archdiocese (including $56,682 for fees);

$125,000 from Lloyd's; and

$346,909 from Interstate (including $40,224 for defense costs).

After the settlement was finalized, Interstate filed this diversity action[2] in federal district court, alleging that it was entitled to reimbursement for the funds it had contributed to the settlement. All parties agreed that Oregon law governs the dispute. Interstate contended that, under Oregon law, each molestation of Grgich was a separate occurrence; in the alternative, it claimed that the series of molestations in each policy period constituted a separate occurrence. Accordingly, Interstate maintained that Grgich's claim triggered coverage in each policy year, and, therefore, the Archdiocese's annual SIRs and the Lloyd's policies should have covered the entirety of the loss represented by the $500,000 settlement. Interstate also

---

1. There is a dispute over the classification of the Lloyd's policies. Interstate considers the Lloyd's policies as primary insurance. Lloyd's characterizes its policies as first layer excess insurance. Resolution of this dispute is unnecessary because it is undisputed that the coverage under Interstate's policy was excess both to the Lloyd's policy and to the Archdiocese's SIR.

2. Interstate is organized under Illinois law. The Archdiocese is a nonprofit corporation organized under Oregon law. The Lloyd's Underwriters are located in the United Kingdom. The insurance companies subscribing to the Lloyd's policies—Excess, Yasuda and Terra Nova—are located in the United Kingdom. Universal is an insurance company organized under New Jersey law. The Archdiocese is the only party having its principal place of business in Oregon.

claimed that even if there were only one occurrence, the policies in effect in each of the four years were triggered because there were separate molestations, and thus separate damages, in each policy period. The Archdiocese and Lloyd's contested Interstate's claim to reimbursement and filed various counterclaims not at issue here. The parties filed cross-motions for summary judgment on the issue of reimbursement, and the district court granted the motions of the Archdiocese and Lloyd's. *See Interstate Fire & Cas. Co. v. Archdiocese of Portland,* 747 F.Supp. 618 (D.Or.1990).

In its opinion, the district court considered a line of cases that determined the number of occurrences by looking to whether "there was one proximate, uninterrupted and continuing cause which resulted in all of the injuries and damage for which the claimant seeks coverage. The question can be stated as: was there a 'single force which, once set in motion, caused multiple injuries?'" *Id.* at 622–23 (citations omitted). Applying this "cause theory," the district court held that the molestations of Grgich from 1979–1983 constituted a single occurrence. In determining whether the single occurrence triggered coverage in one or more policy periods, the district court applied what has been called the "first encounter" rule. The court ruled that since the parties had agreed that Grgich first was molested in 1979, all of the damages arising from the Grgich complaint were covered under the policy in effect in 1979. On this basis, the district court determined that Interstate was not entitled to reimbursement.

After hearing oral argument on Interstate's appeal, we concluded that the dispute raised novel issues of Oregon law. Consequently, we certified a series of questions to the Oregon Supreme Court. The Oregon Supreme Court responded by emphasizing that, under Oregon law, a court's first duty in a contract dispute is to examine the language of the policy to determine the intent of the parties. *See Interstate Fire & Cas. Co. v. Archdiocese of Portland,* 318 Or. 110, 117, 864 P.2d 346, 349 (Or.1993) (on certified questions from the United States Court of Appeal for the Ninth Circuit). The Oregon Supreme Court directed us to *Hoffman Const. Co. v. Fred S. James & Co. of Oregon,* 313 Or. 464, 836 P.2d 703 (Or.1992), which sets forth the methodology for resolving contract language disputes under Oregon law. Under *Hoffman,* the court looks first to the plain meaning of the disputed term. If the term is susceptible of more than one plausible interpretation, the court then must scrutinize the different plausible interpretations in light of the other provisions of the policy. *Id.,* 313 Or. at 474, 836 P.2d at 706; *see also* Or.Rev.Stat. § 742.016 (1993) ("[E]very contract of insurance shall be construed according to the terms and conditions of the policy."). The *Hoffman* court emphasized, moreover, that, although Oregon law provides that ambiguities in insurance contracts are to be construed against the insurer, "a term is ambiguous in a sense that justifies application of [this] rule of construction ... only if two or more plausible interpretations ... continue[ ] to be reasonable, after the interpretations are examined in the light of, among other things, the particular context in which [the] term is used in the policy and the broader context of the policy as a whole." *Hoffman,* 313 Or. at 474, 836 P.2d at 706.

## II. STANDARD OF REVIEW

"A grant of summary judgment is reviewed de novo to determine whether, viewing the evidence in a light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court applied the relevant substantive law." *Tzung v. State Farm Fire & Cas. Co.,* 873 F.2d 1338, 1339–40 (9th Cir.1989).

## III. DISCUSSION

The central issue on appeal is whether the district court correctly determined that the injuries suffered by Grgich as a result of the sexual contacts in the years 1979–1983 arose out of a single "occurrence," as the term is defined in the applicable policies, or whether there were multiple "occurrences."[3] "In any

---

**3.** Although it does not discuss the matter in the argument section of its brief, Lloyd's also suggests that this court lacks jurisdiction over it because Interstate dismissed its appeal from the district court's judgment in favor of Lloyd's. This claim is without merit. In orders entered March 27, 1991 and April 3, 1991, the district court granted summary judgment to Lloyd's and the Archdiocese, respectively. Although Interstate simultaneously appealed both orders, this first appeal subsequently was dismissed on recommendation of the district court because a timely post-judgment motion to amend was pending with respect to the April 3 judgment in favor of the Archdiocese. On April 26, the dis-

such effort, '[t]he primary and governing rule of the construction of insurance contracts is to ascertain the intention of the parties.'" *Hoffman,* 313 Or. at 469, 836 P.2d at 706 (internal citation omitted).

The "assuring clause" in the policies provides:

Underwriters hereby agree ... to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability imposed upon the Assured by law ... for damages ... on account of personal injuries ... arising out of any occurrence happening during the period of Insurance.

The policies define "occurrence" as:

an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury ... during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one location shall be deemed one occurrence.

■ As an initial matter, we note that the assuring clause covers only occurrences that happen "during the period of Insurance." Contrary to the contentions of Interstate, however, the assuring clause does not require that all damages occur within the policy period. With respect to damages, the policy does not set forth any temporal limitation, but, instead, provides without qualification that indemnification extends to all "damages ... *on account of* personal injuries ... *arising out of* any occurrence." One can easily imagine a scenario in which a claimant suffers a serious injury for which he or she continues to incur expenses long after the expiration of the policy. Nothing in the assuring clause would appear to foreclose coverage for such expenses as they would be "on account of" an injury "arising out of" the occurrence. Accordingly, based on the plain meaning of the assuring clause, we conclude that it is the occurrence, rather than the damages, that must "happen during the policy period." *See Board of Higher Educ. v. Northwestern Pac. Indem. Co.,* 69 Or.App. 456, 459, 685 P.2d 1026, 1028 (Or.Ct.App. 1984) (interpreting insurance policy with similar grammatical structure by limiting the

modifying clause to the noun to which it is attached).

The district court concluded, and Lloyd's and the Archdiocese first argue on appeal, that, although Grgich suffered damages in each policy period, his claim implicated only one occurrence—the Archdiocese's continuing negligent supervision of Father Laughlin that led to the series of molestations. Lloyd's and the Archdiocese emphasize that the final sentence of the definition of "occurrence" ("[a]ll such exposure to substantially the same general conditions ... shall be deemed one occurrence") lacks a temporal limitation, thus extending coverage under a single policy to all acts that stem from the same set of "general conditions," regardless of whether those acts occur within the policy period or after the policy period. For the reasons stated below, we conclude that such an interpretation is inconsistent with the express terms of the policies.

■ First, the terms of the policy make clear that negligent supervision alone, whether ongoing or not, would not trigger any obligation on the part of the insurers. Rather, it is the repeated "exposure" of the boy to the negligently supervised priest, resulting in injury, that provides the basis for indemnification. Although the final sentence of the definition of "occurrence" speaks broadly of "general conditions existing at or emanating from one location," the definition twice states unambiguously that it is "exposure" to such conditions, rather than the conditions themselves, that constitutes the occurrence. Second, the language used in the definition of "occurrence" cannot be read in isolation, but must be read in conjunction with the assuring clause. When it is understood that the occurrence is not the Archdiocese's negligent supervision of Father Laughlin as such, but the "exposure" of the boy to the negligently supervised priest, and when this definition is inserted back into the assuring clause, it is clear that the policy covers only "injuries arising out of [the *exposure* of the boy to the negligently supervised priest] *happening during the period of insurance.*"

■ Although the definition of occurrence provides that multiple exposures stemming from the same general conditions can consti-

---

trict court entered its amended judgment, specifically ruling that both the Archdiocese and its "co-defendants" had satisfied their obligations with respect to the settlement. Interstate timely

appealed this order, which implicated Lloyd's as well as the Archdiocese, on May 7, 1991. Accordingly, this court has jurisdiction over both parties.

tute a single occurrence, the assuring clause makes it clear that this is true only of multiple exposures occurring *during the period of insurance.* Accordingly, even though it is undisputed that all of the molestations suffered by Grgich stemmed from his exposure to "the same general conditions existing at ... one location," the clear import of the policy language, as applied to the facts here, is that Grgich's exposure to the negligently supervised priest in each of the four different policy periods constituted a separate occurrence. *Cf. Society of the Roman Catholic Church of the Diocese of Lafayette and Lake Charles, Inc. v. Interstate Fire & Cas. Co.,* 26 F.3d 1359, 1363–64 (5th Cir.1994) (reaching similar conclusion on nearly identical facts); *St. Paul Fire & Marine Ins. Co. v. McCormick & Baxter Creosoting Co.,* 126 Or.App. 689, 698–99, 870 P.2d 260, 264–65 (Or.Ct.App. 1994) (applying similar methodology to find that a provision in occurrence policies requiring that damages occur "during the policy period" unambiguously imposes no requirement that the existence of the damages be discovered during the policy period), *modified on other grounds,* 128 Or.App. 234, 875 P.2d 537 (Or.Ct.App.1994).

Lloyd's and the Archdiocese make a number of additional arguments against a finding that Grgich's claim implicated more than one occurrence. They first contend that such an interpretation of the policies makes the determination of the number of occurrences turn arbitrarily on the length of the policy period. This argument is without merit. Insurers charge different rates for policies with different applicable policy periods precisely because the extent of the risk varies with the duration of the policy. *See Archdiocese of Lafayette,* 26 F.3d 1359, at 1366 (stating that "a three-year 'occurrence' policy provides less coverage than three one-year policies, because an occurrence could last longer than one year. While an insurance policy should be interpreted in favor of the insured, we see no justification for providing more insurance coverage than the insured bargained for.").

■ Lloyd's and the Archdiocese next contend that because there would have been no subsequent molestations *but for* the Archdiocese's failure to remove Father Laughlin from his position in 1979, all of Grgich's damages stemmed from injuries arising out of the 1979 occurrence. This argument again ignores the clear import of the policy language. As discussed above, analysis of the policy makes clear that the "occurrence" is not the Archdiocese's negligent supervision of Father Laughlin or failure to remove Father Laughlin, but, rather, the *exposure* of the boy to the negligently supervised priest. Once this is understood, the "but for" argument collapses—it simply is not true that, *but for* the exposure of the boy to the priest in the first policy period, there would have been no subsequent acts of molestation. There is no basis in the record to support a finding that, had Father Laughlin not met the boy until 1980, there would have been no molestations. Further, as the Supreme Court of Oregon expressly warned in its response to the questions we certified, the use of tort concepts as an aid in interpreting an insurance policy is appropriate only to the extent that such concepts are expressly, or by clear inference, incorporated in the policy. *See Interstate Fire & Cas. Co. v. Archdiocese of Portland,* 318 Or. 110, 118, 864 P.2d 346, 349 (Or.1993) (on certified questions from the United States Court of Appeals for the Ninth Circuit). No party to this appeal has argued that the relevant portions of the policies make any reference, direct or indirect, to "but for" causation or to any other tort concept. Accordingly, we conclude that the "but for" argument of Lloyd's and the Archdiocese is without merit.

The Archdiocese and Lloyd's further contend that there can only be one occurrence because any other construction would lead to a violation of the rule that an insurer cannot insure against a loss that already has begun. By positing that the entire series of molestations constituted a single "loss," as that term is used in the policies, this argument assumes what it seeks to prove. Here, there is distinct loss in each policy period because, as stated above, each policy covers only damages arising from the molestations "happening during the period of Insurance." As the *Diocese of Lafayette* court reasoned in directly analogous circumstances: "A subsequent molestation, occurring outside the policy period, is not a consequential damage of the previous molestation; it is a new injury, with its own resulting damages." 26 F.3d 1359, at 1366. Because the loss under any given policy includes only damages stemming from molestations occurring within the policy period, and because there were distinct acts and distinct damages requiring indemnification in each policy period, this argument too must fail.

Finally, the Archdiocese argues that it would be contrary to public policy to find that the molestations of Grgich constituted more than one occurrence, noting that such a finding would require the Archdiocese to pay more than one SIR. The Archdiocese claims that the effect of such a ruling would be that, by purchasing additional policies, it actually received *less* coverage. Like the previous argument, this argument assumes what it seeks to prove, and would be persuasive only if it first were established that a single policy provided indemnification for all of Grgich's damages. Because coverage under each of the policies was limited to damages stemming from incidents occurring during the policy period, the Archdiocese would have had to pay not only the 1979 SIR but also the entirety of the loss stemming from the post–1979 molestations had it not renewed its policies after 1979. Depending on how the loss represented by the settlement sum is apportioned among the four policy periods, a matter which we do not resolve here (*see* discussion *infra* ), the financial burden could well fall heavily, on the Archdiocese. However unfortunate such a result would be from the perspective of the Archdiocese, it is dictated by the terms of the policies the Archdiocese purchased. *See National Chiropractic Mut. Ins. Co. v. Morgan,* 116 Or.App. 196, 204, 840 P.2d 732, 736 (Or.Ct.App.1992) (noting that, under Oregon law, the court should rely on "what it perceives to be the understanding of the ordinary purchaser of insurance" only if the policy language is ambiguous and analysis of the competing interpretations in the context of the policy as a whole fails to resolve the ambiguity).

In sum, because each policy covers only damages stemming from Grgich's exposure to Father Laughlin occurring during the policy period, and because the parties do not contest that Grgich was exposed to the negligently supervised priest in each of the four policy periods, we conclude that Grgich's claim implicates four occurrences. Accordingly, the district court's grant of summary judgment, premised on a finding of only one occurrence, must be reversed.

Interstate urges us to conclude further that, because there is no factual basis for dividing the damages among the policy periods, an equal portion of the damages should be allocated to each of the policy periods,

thereby entitling Interstate to full reimbursement. We do not reach the apportionment issue or the arguments addressed to the issue by either party, however, because at least one unresolved issue remains for consideration on remand that might obviate the need for such a determination. *Cf. St. Paul Fire & Marine,* 126 Or.App. at 699–700, 870 P.2d at 265 (emphasizing that "[t]he apportionment of liability is a separate issue from the trigger of coverage issue," and declining to address the apportionment issue despite the trial court's conclusion that apportionment by policy period is not possible). Specifically, we note that the district court emphasized in its opinion that, because of its conclusion that Grgich's claim implicated only one occurrence, it was not reaching the question of whether Interstate "properly reserved its right" to challenge the allocation made at the time of the settlement. *Archdiocese of Portland,* 747 F.Supp. at 625. Resolution of this latter issue could be dispositive, and we leave the ultimate disposition of the case, including the determination of an appropriate apportionment among the policy years, should such a determination be necessary, to the district court on remand.

## IV. CONCLUSION

For the reasons described above, we reverse the district court's grant of summary judgment and remand.

REVERSED and REMANDED.

Before: D.W. NELSON, TROTT and T.G. NELSON, Circuit Judges.

## ORDER

Oct. 19, 1994

The members of the panel that decided this case voted unanimously to deny the petitions for rehearing and to reject the suggestions for rehearing en banc.

The full court has been advised of the suggestions for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. (Fed.R.App.P. 35.)

The petitions for rehearing are denied and the suggestions for rehearing en banc are rejected.