Argued and submitted May 24, 2004, on appeal, reversed and remanded on plaintiff's duty to defend claim against defendants Transportation Insurance Company and Continental Casualty Company with instructions to grant petitioner's motion for summary judgment and otherwise affirmed; affirmed on cross-appeal
January 26, 2005

## SCHNITZER INVESTMENT CORP.,
an Oregon corporation,
*Appellant - Cross-Respondent,*

*v.*

## CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON
and Certain London Market Insurance Companies,
*Respondents - Cross-Appellants,*

*and*

## INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA,
Transportation Insurance Company,
Continental Casualty Company,
Insurance Company of North America,
and Phoenix Insurance Company,
*Respondents.*

9902-02004; A116662

104 P3d 1162

Charles F. Hinkle argued the cause for appellant - cross-respondent. With him on the opening brief were Joan P. Snyder and Stoel Rives LLP. With them on the reply brief was Ryan W. Bounds.

Paul J. Killion argued the cause for respondents - cross-appellants. With him on the briefs were Michael A. Gevertz, Edward J. Tafe, and Hancock Rothert & Bunshoft LLP, San Francisco, and I. Franklin Hunsaker and Bullivant Houser Bailey PC.

Helen A. Boyer argued the cause for respondent Insurance Company of the State of Pennsylvania. With her on the briefs were Curt H. Feig, Thomas M. Jones, and Cozen O'Connor, Seattle.

David E. Prange argued the cause for respondents Transportation Insurance Company and Continental Casualty Company. With him on the brief were Marjorie A. Speirs, Janet M. Schroer, and Hoffman, Hart & Wagner, LLP. With him on the supplemental response brief was Abbott & Prange, P. C.

R. Lind Stapley argued the cause for respondent Insurance Company of North America. With him on the joint brief were Soha & Lang and Peter R. Chamberlain, Richard A. Lee, and Bodyfelt Mount Stroup & Chamberlain LLP.

Timothy R. Volpert, Everett W. Jack, Jr., and Davis Wright Tremaine LLP filed the briefs for respondent Phoenix Insurance Company.

William H. Walters and Miller Nash LLP, and Edward J. Stein and Anderson Kill & Olick, P. C., filed the brief *amicus curiae* for ZRZ Realty Company, Zidell Remediation Funding Trust, Zidell Marine Corporation, Tube Forgings of America, Inc., and Pon Exploration, Inc.

Gregory L. Baird, Diane L. Poslcer, and Gordon & Polscer, LLP and Laura A. Foggan, John C. Yang, Thomas S. Garrett, and Wiley Rein & Fielding LLP filed the brief *amicus curiae* for Complex Insurance Claims Litigation Association.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Erika L. Hadlock, Assistant Solicitor General, filed the brief *amicus curiae* for State of Oregon.

Before Edmonds, Presiding Judge, and Wollheim and Schuman, Judges.

EDMONDS, P. J.

.

## EDMONDS, P. J.

Plaintiff Schnitzer Investment Corporation owns land in Portland on which it, its predecessors, and previous owners conducted a variety of industrial activities over many decades, resulting in contamination of the land. The Department of Environmental Quality (DEQ) required plaintiff to remedy the contamination at significant expense to plaintiff.[1] Defendants are insurance companies that issued policies to plaintiff and its predecessors. Plaintiff asserts that defendants are liable under those policies for all or part of the cost of the cleanup and for defending against DEQ's demands. The trial court granted summary judgment to defendants on all of plaintiff's claims. ORCP 47 C. It also denied Certain Underwriters at Lloyd's of London's and Certain London Market Insurance Companies' (collectively Lloyd's) requests for attorney fees. Plaintiff appeals, and Lloyd's cross-appeals. On plaintiff's appeal, we reverse as to the claim against defendants Transportation Insurance Company and Continental Casualty Company (collectively CNA) on the duty to defend claim and otherwise affirm. On the cross-appeal, we affirm.

■    We state the facts most favorably to plaintiff as the nonmoving party on the summary judgment motions, drawing all inferences in its favor. *Robinson v. Lamb's Wilsonville Thriftway*, 332 Or 453, 455, 31 P3d 421 (2001). Plaintiff's land is located on the west side of the Willamette River, directly south of the Marquam Bridge. The extreme northeastern portion of the land fronts directly on the river, but a third party's land separates the rest of the eastern border from the river. Plaintiff used the property for a number of industrial activities, including metal salvaging, that resulted in environmental contamination. Previous owners had used it for other activities, including the manufacture of pesticides and other agricultural chemicals, that also resulted in environmental contamination. Most of the contamination was in the soil, but the groundwater at various locations on the property also contains a variety of hazardous chemicals. At some locations, there is groundwater only 10 feet below the

---

[1] Plaintiff recovered part of its expenses from a previous owner.

surface. Contaminated soil is in contact with the ground-water, at least during part of the year, in many sections of the property.

In 1988, plaintiff, as part of its plans to develop the property, contracted with an engineering firm to conduct an investigation. That investigation revealed the contamination. Plaintiff voluntarily reported the contamination to DEQ, which, in turn, notified plaintiff that it would place the property on a list of confirmed contaminated sites unless plaintiff appealed its decision. Plaintiff appealed. On August 1, 1989, DEQ and plaintiff entered into a consent order that required plaintiff to determine the "nature and extent of releases of hazardous substances on or from plaintiff's [p]roperty * * * and to develop, evaluate, and select appropriate removal and/or remedial measures" that would comply with Oregon law. The order divided the property into three units, A, B, and C, for purposes of the evaluation. Shortly thereafter, the engineering firm began a study to develop, evaluate, and select the appropriate remedial measures. The studies for units A and C were completed on September 27 and October 1, 1991. Those studies recommended substantial remedial actions concerning the soil in those units. The studies also recommended monitoring the groundwater under the units for five years. Any further actions concerning the groundwater would depend on what the monitoring revealed.[2]

During the course of the studies, plaintiff continued to be in contact with DEQ. On September 4, 1990, DEQ notified plaintiff that it proposed to include the property both on its list of confirmed contaminated sites and on its inventory of sites that required further investigation or cleanup. The letter did not specifically describe the problems on plaintiff's property; however, it did invite plaintiff's comments on the proposed listings. On June 7, 1991, DEQ sent a second letter notifying plaintiff that it was including units A and C on both listings. The June 7 letter indicated that the property could be removed from the listings "after all necessary cleanup is completed, including continuing environmental controls such

---

[2] Unit B was not sufficiently contaminated to require remedial measures and is not otherwise involved in this case.

as groundwater monitoring and special land use restrictions." DEQ enclosed with the letter its response to plaintiff's comments on the proposed listing and a summary of the contamination on the property. The summary showed the concentration of each contaminant in the soil but did not indicate that there was contamination in the groundwater or any medium other than the soil. The description of the environmental and public health threats resulting from the contamination in the summary stated: "Exposure to contaminated soil/sediments."

Before describing further events, we first discuss the insurance polices that are at issue in this case. Beginning in 1958, defendants issued a number of insurance policies insuring plaintiff or its predecessors against claims for property damage. Some of the policies were primary, while others were umbrella or excess policies; the umbrella and excess policies generally followed the coverage of the primary policies. Although the language varied in some respects, the 1977-83 CNA policies that are the subject of plaintiff's duty to defend claim are typical. Under them, CNA promised to pay all sums that plaintiff became "legally obligated to pay as damages" because of "property damage." CNA had "the right and duty to defend any suit against the insured seeking damages on account of such * * * property damage"; it also agreed to pay the costs of defense in addition to the face amount of the policies.

The policies defined "property damage" to mean

"(1) physical injury to or destruction of tangible property which occurs during the policy period including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period[.]"

They also defined an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in * * * property damage neither expected nor intended from the standpoint of the insured." Finally, and most importantly to this case, the policies contained a number of exclusions from coverage, including an exclusion for property damage to "property owned or occupied by or rented to the insured[.]"

Plaintiff concedes that, although the excess policies that various defendants issued use different wording, they also effectively exclude coverage for property that the insured owns.

On September 26, 1991, plaintiff sent CNA a letter notifying it of DEQ's action listing the property and requesting that CNA "immediately defend, indemnify, hold harmless and otherwise protect Schnitzer's interests in this matter" pursuant to its obligations under the CNA primary policies. Plaintiff's letter briefly described the circumstances on the property and the steps that it had previously taken. It also enclosed a copy of DEQ's June 7, 1991, letter, including DEQ's enclosures. Plaintiff specifically told CNA in its letter that some of the contaminants on the property might be entering the groundwater and endangering local water supplies. It referred to DEQ's original notification of its intent to list the site and also told CNA that it had entered into a voluntary consent order with DEQ on August 1, 1989, "to determine the nature and extent of releases of hazardous substances and to develop, evaluate and select appropriate removal and/or [sic] remedial measures." Finally, it stated that a draft of the report being prepared by its own engineering firm was available for CNA's review.[3] CNA did not immediately respond.

In September 1993, DEQ entered a Record of Decision for Unit C, followed by entry of a Record of Decision for Unit A in April 1995. The Records of Decision described the contamination that the investigation had discovered in each unit and established the remedial actions that DEQ required plaintiff to take. Those actions primarily involved removing much of the contaminated soil and managing the remaining soil to isolate it from users, thus making it possible to develop the sites. The required actions did not include remedying any contamination of the groundwater. The studies had indicated that the groundwater was not contaminated to levels above those established as safe and that the contaminants in the soil were tightly bound to the soils and were not likely to migrate into the groundwater. DEQ, however, did require plaintiff to monitor the groundwater for five years. Under

---

[3] At the same time plaintiff also asserted claims against other insurance policies; all insurers denied the claims.

that requirement, if there was no additional degradation of the groundwater during that period the monitoring requirement could be removed; if degradation occurred, DEQ reserved the right to require remedial measures.

On August 17, 1994, CNA denied plaintiff's request to defend and to indemnify it on the ground, among others, that the property allegedly damaged belonged to plaintiff and thus was excluded from the coverage of the policies. In August and September 1995, DEQ filed civil actions in circuit court against plaintiff to enforce the requirements that it had imposed; at the same time, DEQ and plaintiff stipulated to the entry of judgments that were consistent with the complaints in the civil actions. Plaintiff undertook the remedial measures and monitoring that DEQ required. The monitoring consistently indicated that the groundwater was not becoming further contaminated and that it remained within safe limits. DEQ terminated the monitoring requirement in 1999.

Plaintiff filed this action in February 1999, seeking to recover the expenses that it had incurred in investigating and remedying the contamination on its property. The trial court ultimately granted defendants' motions for summary judgment on all of plaintiff's claims and entered judgment in favor of defendants. On appeal, plaintiff makes seven assignments of error and raises a number of arguments under each assignment; we discuss only those arguments that are determinative to our decision. We begin with some general observations. Under ORCP 47 C, we review the trial court's decision to determine whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as matter of law. We construe insurance policies as a matter of law. When there are cross-motions for summary judgment, and the granting of one and denial of the other are both assigned as error, both are subject to review. *Mutual of Enumclaw Ins. Co. v. Payne*, 164 Or App 664, 667, 993 P2d 186 (1999).

Plaintiff first assigns error to the trial court's grant of CNA's motion for summary judgment on plaintiff's claim for

breach of the duty to defend it against DEQ's claims of environmental contamination and to the court's denial of plaintiff's motion for partial summary judgment that CNA had such an obligation.[4] The basic rules pertaining to an insurer's duty to defend are well established:

> "Whether an insurer has a duty to defend an action against its insured depends on two documents: the complaint and the insurance policy. * * * An insurer has a duty to defend an action against its insured if the claim against the insured stated in the complaint could, without amendment, impose liability for conduct covered by the policy. * * *

> "In evaluating whether an insurer has a duty to defend, the court looks only at the facts alleged in the complaint to determine whether they provide a basis for recovery that could be covered by the policy[.] * * * An insurer should be able to determine from the face of the complaint whether to accept or reject the tender of the defense of the action.

> "The insurer has a duty to defend if the complaint provides *any basis* for which the insurer provides coverage. * * * Even if the complaint alleges some conduct outside the coverage of the policy, the insurer may still have a duty to defend if certain allegations of the complaint, without amendment, could impose liability for conduct covered by the policy. * * * Any ambiguity in the complaint with respect to whether the allegations could be covered is resolved in favor of the insured."

*Ledford v. Gutoski*, 319 Or 397, 399-400, 877 P2d 80 (1994) (citations omitted; emphasis in original).

■ An administrative agency's requirement that a property owner clean up environmental contamination constitutes a "suit" within the terms of an insurer's duty to defend. *St. Paul Fire v. McCormick & Baxter Creosoting*, 126 Or App 689, 700-01, 870 P2d 260, *modified on recons*, 128 Or App 234, 875 P2d 537 (1994), *aff'd in part, rev'd in part on other grounds*, 324 Or 184, 923 P2d 1200 (1996). The initial difficulty under the first assignment of error, however, is determining when the "suit" against plaintiff was filed. DEQ first

---

[4] In its reply brief, plaintiff made it clear that its assignment of error regarding the duty to defend issue concerns only CNA and not any of the other defendants.

set out its contentions in a way that is comparable to a complaint in court or charges in an administrative contested case proceeding in 1995, when it filed the complaints that resulted in the stipulated judgments concerning units A and C. But that action was largely a formality. It came after plaintiff and the DEQ had resolved their disputes over what plaintiff was required to do; the stipulated judgments simply put their agreement in a judicially enforceable form. CNA argues, however, that it did not have a duty to defend plaintiff until DEQ filed those complaints; before then, according to CNA, there was no "suit" for it to defend.

When this kind of issue arises in a civil action filed in circuit court, *Ledford* gives clear guidance: the insurer is to compare the factual allegations in the complaint to the coverage in the insurance policy. The filing of the complaint, thus, triggers the duty to defend. The same is true of administrative contested cases in which an agency files charges in a form similar to a judicial complaint. *See Sch. Dist. No. 1 v. Mission Ins. Co.*, 58 Or App 692, 703-04, 650 P2d 929 (1982), *rev den*, 294 Or 682 (1983) (holding that the word "suits" in an insurance policy encompassed administrative proceedings); *School District No. 1 v. Nielsen*, 271 Or 461, 469-72, 534 P2d 1135 (1975) (describing the role of specific charges in administrative contested case). Also, in *St. Paul Fire* we held that an administrative agency's enforcement of environmental laws under which the insured was going to have to pay constituted a "suit" for purposes of an insurance policy. 126 Or App at 700-01.

The question before us is whether the information that CNA received from plaintiff in 1991 also constituted a "suit" within the meaning of defendants' policies. The resolution of that question is a question of law because it involves the interpretation of the parties' policies. Our task is to ascertain their intentions by first examining the terms of the policies. *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 836 P2d 703 (1992). Here, the policies do not define the word "suit." Accordingly, we consider the ordinary meaning of the word. *See Clinical Research Institute v. Kemper Ins. Co.*, 191 Or App 595, 601, 84 P3d 147 (2004). One of the ordinary meanings of the word "suit" is "the attempt to gain an

end by any legal process." *Webster's Third New Int'l Dictionary* 2286 (unabridged ed 2002).[5]

In this case, DEQ included its response to plaintiff's previous comments with its June 7, 1991, letter confirming the listing of units A and C. It also enclosed the facility report that contained the information that it placed in the listings. The June 7 letter itself contained little specific information about the units, but the enclosed documents gave some details. In addition, plaintiff told CNA in its September 26, 1991, letter that it had previously entered into a consent order with DEQ "to determine the nature and extent of releases of hazardous substances and to develop, evaluate and select appropriate removal and/or [sic] remedial measures." The consent order contains DEQ's factual contentions concerning the condition of the property, the accuracy of which plaintiff did not admit. At the least, CNA had to treat those documents at that time as the functional equivalent of a judicial complaint. When read together, they described the factual basis on which DEQ sought to hold plaintiff liable for the cost of the environmental cleanup of its property. We conclude for that reason, and consistently with our decision in *St. Paul Fire*, that as of September 26, 1991, CNA had the duty to defend plaintiff with regard to the actions against plaintiff being taken by the DEQ. That duty continued as to each unit until the Record of Decision for that unit was filed.

We turn next to the issue of the scope of CNA's duty to defend. The parties agree that plaintiff owns the contaminated soil on the property. They also agree that, as a result of the "owned property" exclusion in the policies, CNA has no duty to defend against claims related solely to the soil and that all defendants, including CNA, have no duty to pay the expenses of remedying that contamination.[6] Plaintiff argues, however, that the studies also showed that the groundwater

---

[5] In ORS 464.480, the legislature, among other things, has established what constitutes a "suit" for the purposes of the duty to defend against an agency's requirement to remedy environmental contamination. ORS 464.480(1)(a). Because plaintiff demanded a defense from CNA in 1991, we do not need to determine the extent to which the statutory requirements extend or modify the criteria that we discuss in this case.

[6] We discuss below plaintiff's claim that certain policies did not contain an owned property exclusion.

under the property is contaminated and that some of the actions that DEQ threatened to require plaintiff to take involved evaluating and remedying the contamination of the groundwater.

The beginning point for our analysis is that all water in this state from all sources of water supply belongs to the public, ORS 537.110, as does the right to the reasonable control of all sources of water supply, including groundwater. ORS 537.525. Thus, contamination of groundwater is damage to property other than that of the insured, and the owned property exemption in the policies does not apply to it. *See St. Paul Fire*, 126 Or App at 700; *Lane Electric Coop. v. Federated Rural Electric*, 114 Or App 156, 160-61, 834 P2d 502, *rev den*, 314 Or 727 (1992). The issue that the parties dispute for purposes of the scope of CNA's duty to defend is whether there is evidence that would permit a jury to find that there was a possibility that DEQ would require plaintiff to remedy the contamination to the groundwater. We conclude that there was such a possibility as to each unit until the entry of the Record of Decision for that unit.

In the 1989 consent order, DEQ made a number of findings and conclusions. Although plaintiff did not admit those findings and conclusions, they contained DEQ's contentions and structured the investigative studies that plaintiff agreed to undertake. In its findings, DEQ listed the concentrations of contaminants that the previous studies had revealed in the soils and in the groundwater. Among DEQ's conclusions was that the "presence of hazardous substances in soils and groundwater at the site constitutes a 'release' or 'threat of release' into the environment under ORS 466.540(14)" and that plaintiff was a person liable for remedial action costs. The consent order also contemplated that plaintiff would be responsible for any remediation that was necessary. The facility report that DEQ subsequently included with the June 7, 1991, letter included a list of the concentrations of contaminants in the soil; it did not mention contaminants in the groundwater. The facility report described the environmental and public health threats from the contamination as "[e]xposure to contaminated soil/sediments." DEQ also stated in the June 7 letter that the property could be removed from the lists after the necessary

cleanup was completed, "including continuing environmental controls such as groundwater monitoring or special land use restrictions."

We do not need to consider the merits of plaintiff's argument concerning the contents of the facility report because we conclude that the consent order by itself shows that there was a possibility that DEQ would require plaintiff to remedy the groundwater under the site. In the consent order, DEQ stated that the presence of contaminants in the groundwater necessitated measures to protect the public health, safety, and welfare and the environment. Those statements told CNA that DEQ intended to impose liability on plaintiff for any damage to the groundwater. Because the "owned property" exclusion from coverage under the policy did not apply to damage to the groundwater, CNA should have concluded that it had a duty to defend plaintiff at the time of plaintiff's September 26, 1991, letter. We conclude that the trial court erred in granting summary judgment to CNA on the duty to defend claim, as well as in denying summary judgment to plaintiff on that claim, for the periods before the entry of the Records of Decision.[7]

█ In its second assignment of error, plaintiff argues that defendants have a duty to indemnify it for the expenses that it incurred in remedying the contamination on the property. The question under this assignment implicates the fact that the policies exclude coverage for damage to plaintiff's own property (damage to the soil) and focuses on whether there is evidence that DEQ required plaintiff to take actions for purposes that included remedying the contamination of the groundwater as well that of as the soil. The record on summary judgment contains extensive evidence concerning the contamination of the property and DEQ's requirements regarding it. That evidence includes the investigative studies for each unit, the Record of Decision for each unit, and affidavits from the DEQ official who was responsible for ensuring that plaintiff properly performed the remedial

---

[7] CNA also asserts that the trial court erred in denying its motion to strike plaintiff's claim for prejudgment interest. That is an issue for the trial court to consider on remand.

work. The parties make a number of arguments based on that evidence.

We conclude that there is no genuine issue of material fact as to the following decisive points: First, when plaintiff's remediation efforts began, the groundwater was contaminated with several substances, but the contamination did not exceed safe levels. Second, the contaminants in the soil were tightly bound to the soil and were unlikely to migrate to the groundwater in significant amounts. Third, in the Records of Decision DEQ required plaintiff to engage in extensive actions to prevent further contamination of the groundwater, but it did not require plaintiff to take any actions to remedy the contamination that already existed. Fourth, in the Records of Decision DEQ required plaintiff to monitor the groundwater for a number of years to determine if further actions were necessary; if anything, the subsequent monitoring revealed that the groundwater became less rather than more contaminated during those years.

The issue that those facts present is whether defendants had a duty to indemnify plaintiff for actions that involved preventing further damage to the groundwater but that did not involve remedying the existing contamination. We conclude that defendants did not have such a duty. Defendants' obligation under their policies was to pay amounts that plaintiff became "legally obligated to pay as damages" because of "property damage." The relevant policies define "property damage" as "physical injury to or destruction of tangible property which occurs during the policy period including the loss of use thereof at any time resulting therefrom" or in terms that are functionally equivalent. There is no policy definition for the word "damages" and we therefore apply the commonly understood meaning of the word to reach our conclusion. "Damages" are "the estimated reparation in money for detriment or injury *sustained.*" *Webster's* at 571 (emphasis added). There is no evidence that DEQ required plaintiff to take any action to remedy the contamination of the groundwater—that is, to provide reparation for the injury that the groundwater had in fact sustained. It follows that there is also no evidence that plaintiff was legally obligated to pay anything because of the *existing* contamination of the groundwater. Although that existing

contamination constituted "physical injury to tangible property," and thus constituted "property damage" under the terms of the policies, plaintiff did not become "legally obligated to pay" any sums as a result of that property damage. The actions that DEQ required plaintiff to take—and thus the money that DEQ required plaintiff to spend—related to remedying the damage to plaintiff's own property—the soil—and to preventing further damage to the groundwater. The terms of the policies do not require defendants to pay to prevent property damage; they require payment only to repair property damage that has actually occurred. Because plaintiff did not incur any expenses for that purpose, it did not suffer any damages for which defendants were liable. The trial court correctly granted summary judgment to defendants on the issue of the duty to indemnify.

In its third assignment of error, plaintiff challenges the trial court's grant of defendants' motions for summary judgment on plaintiff's claims concerning "lost policies"—that is, policies that plaintiff claims existed but that neither it nor defendants are currently able to locate. Those lost policies purportedly contained an "owned property" exclusion from coverage; plaintiff concedes that the third assignment must fail if we hold, as we have, that the second assignment of error fails.

The fourth assignment of error concerns the trial court's grant of summary judgment to defendants on plaintiff's claims against lost CNA and Lloyd's policies for which, according to plaintiff, there is evidence that CNA agreed to delete the "owned property" exclusion.[8] The policies involved were for the years 1959 through 1962. Plaintiff relies on the testimony of its controller and chief financial officer for that time period, who testified in a deposition that he insisted that CNA delete from the policies the "care, custody, and/or [sic] control" exclusion from coverage.[9] The parties located the

---

[8] The Lloyd's policies were excess to the CNA policies. Plaintiff argues that they "followed form" to the primary policies and that, therefore, if there was no owned property exclusion in the CNA policies, there was also no owned property exclusion in the Lloyd's policies. Because we conclude that CNA was entitled to summary judgment concerning the primary policies, we do not reach the issue of the excess policies.

[9] Under the "care, custody, and/or control" exclusion, damage to property that the insured does not own, but that is in the insured's care, custody, or control at the time of the damage, is excluded from coverage.

form that CNA used for its general liability policies at the time of the alleged lost policies. The paragraph of the form that contains the "care, custody, and/or control" exclusion also includes the "owned property" exclusion. Plaintiff's witness testified that "there was a paragraph, I recall, and I want—with a 'care-custody-and-control' exclusion, and I wanted that deleted." When asked if CNA deleted the entire paragraph, he responded, "I think they—I'm sure they deleted the entire paragraph, because I was concerned that if something else came up that I wasn't aware of, I didn't want to take any chance of omitting anything that should have been deleted." The witness also testified that he did not have a memory of any specific portions of the policies in question.

In addition to that evidence, CNA offered evidence that, at the relevant times, it did not have a standard endorsement for modifying the "care, custody, and/or control" exclusion and that the endorsements that it later developed retained the "owned property" exclusion as part of the policy. According to CNA, any modification of the "care, custody, and/or control" exclusion would have had to have been made by a special endorsement that required approval at a higher underwriting level in the company.

ORCP 47 C provides that

> "[n]o genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment."

There is a genuine issue of material fact concerning whether CNA agreed to delete the "care, custody, and/or control" exclusion from the lost CNA policies. The issue, however, is whether an objectively reasonable juror could also infer that CNA deleted the entire paragraph, including the "owned property" exclusion, from the policy after plaintiff requested that it delete the "care, custody and/or control" exclusion.

The flaw in the controller's testimony is that he did not testify that, in fact, plaintiff received a policy from CNA that deleted the entire paragraph containing the owned property exclusion after he made his request for the deletion of a

separate exclusion that happened to be part of the same paragraph. A reasonable juror would have to speculate that CNA did more than what was requested of it. Plaintiff relies entirely on the fact that several exclusions were contained in the same paragraph in the standard CNA policy and on a narrow, literal reading of portions of the controller's testimony without considering its context. There is no indication that the controller asked that any other exclusion be deleted or that he even discussed the deletion of any other exclusion with CNA. In that context, the only reasonable inference to be drawn from the controller's reference to deleting the "entire paragraph" is that CNA agreed to delete all portions of the policy that related to the "care, custody, and/or control" exclusion. We conclude that no reasonable factfinder could determine on this record that CNA also deleted the "owned property" exclusion from the lost policies. The trial court therefore did not err in granting summary judgment to defendants on plaintiff's lost policy claims.

In its fifth assignment of error, plaintiff asserts that the trial court erred in granting summary judgment to Lloyd's on the ground that plaintiff had not exhausted its primary coverage. Because plaintiff was not entitled to be indemnified by a primary insurer for the costs of restoring its own property, there is also no liability on the part of the excess carriers to indemnify plaintiff for those expenses.

In its sixth assignment of error, plaintiff asserts that the trial court erred by granting summary judgment to the Insurance Company of North America (INA) on statute of limitations grounds. The trial court granted INA's motion before the other defendants filed their summary judgment motions. INA defends the trial court's action solely on statute of limitations grounds. However, the parties agree that the coverage in the applicable INA policy is substantially identical to that in the policies that the other defendants issued. Because INA would be entitled to summary judgment on the same grounds as the other defendants, any error in granting the motion on statute of limitations grounds is harmless.

Finally, in its seventh assignment of error, plaintiff asserts that the trial court erred in denying its claim against Lloyd's for intentional misrepresentation in failing to disclose

the existence of two policies insuring plaintiff. However, for the reasons that we have previously discussed, Lloyd's has no liability to plaintiff under those policies, and plaintiff therefore cannot have suffered any damages from any failure by Lloyd's to disclose the existence of its policies with plaintiff.

■     We turn to the cross-appeal, in which Lloyd's assigns error to the trial court's conclusion that it was without authority to award attorney fees to Lloyd's.[10] Lloyd's relies on ORS 746.350 and ORS 746.320. ORS 746.350 provides:

> "In any action against an unauthorized insurer in which service of process was made in the manner provided in ORS 746.320, the court may award reasonable attorney fees to the prevailing party."

Thus, in order to award attorney fees under ORS 746.350, a court must find both that the case involves an action against an unauthorized insurer[11] and that the insurer was served in the manner provided in ORS 746.320.

ORS 746.320 provides, in part:

> "(1)   When an unauthorized insurer does any of the acts specified in subsection (2) of this section in this state, by mail or otherwise, the doing of such acts shall constitute an appointment by such insurer of the Director of the Department of Consumer and Business Services, and the successor in office, as its lawful attorney upon whom all process may be served in any action begun by or on behalf of an insured or beneficiary and arising out of policies of insurance between the insurer and persons residing or authorized to do business in this state. Subject to subsection (4) of this section, the doing of any such act shall signify

---

[10] For these purposes, "Lloyd's" refers to those Certain Underwriters at Lloyd's of London and those Certain London Market Insurance Companies who have appeared and participated in this litigation and who filed the motion for attorney fees. It does not refer to other such entities whom plaintiff served by substituted service on the Director of the Department of Consumer and Business Affairs but who have not appeared or otherwise participated.

[11] Lloyd's asserts that it is an unauthorized insurer because it operates in Oregon under ORS 735.400 to 735.495, the Surplus Lines Law, which governs the actions of nonadmitted insurers. Plaintiff does not assert that there is a distinction between a nonadmitted insurer under that statute and an unauthorized insurer under ORS 746.310 to 746.370; indeed, it asserted to the trial court that there is no distinction. We therefore do not consider that question.

the insurer's consent that service of process upon the director is of the same legal force and effect as personal service of process upon such insurer within this state.

"* * * * *

"(3)   Service of process upon the director shall be made by delivering to and leaving with the director, or with any clerk on duty in the office, two copies of such process. Immediately after service of process, the director shall send one of such copies to the defendant insurer at its principal office. The director shall keep a record of all processes served upon the director under this section.

"(4)   Service of process in the manner provided in this section gives jurisdiction over the person of an insurer provided:

"(a)   Notice of such service and a copy of the process are sent by registered mail or by certified mail with return receipt by the plaintiff, or the attorney of the plaintiff, to the defendant insurer at its principal office within 10 days after the date of service; and

"(b)   The defendant insurer's receipt, or receipt issued by the post office with which the letter is registered or certified, showing the name of the sender of the letter and the name and address of the person to whom the letter is addressed and an affidavit of the plaintiff, or the attorney of the plaintiff, showing compliance with this section are filed with the clerk of the court in which the action against such insurer is pending on or before the date on which such insurer is required to appear, or within such further time as the court may allow.

"(5)   Nothing contained in this section shall limit or abridge the right to serve any process upon an insurer in any other manner then permitted by law."

According to the record before us, plaintiff did not serve the Lloyd's insurers who have appeared in this action, and who seek attorney fees under ORS 746.350, by following the procedure described in ORS 746.320(3). Rather, in its original complaint, plaintiff identified five Lloyd's policies, each of which was subscribed by a number of syndicates or companies that did business at Lloyd's.[12] Plaintiff served the

---

[12] Each subscribing syndicate or company agreed to assume a designated portion of the risk under the policy. It is common for a single Lloyd's policy to have many subscribing syndicates or companies.

companies or syndicates that subscribed to two of the policies by serving the agent for service of process designated in those policies. After it did so, and after the trial court entered a case management order, the parties agreed to a master service list for the case. That master list designated specific law firms as counsel of record for Lloyd's. Thereafter, plaintiff filed a First Amended Complaint and served it on all defendants in accordance with the master service list, including serving the firms listed as counsel for Lloyd's. In response to that service, Lloyd's attorneys filed an appearance in which they listed the specific syndicates and companies for which they were appearing. Those specific syndicates and companies then participated in the rest of the case and filed the petition for attorney fees that is the subject of the cross-appeal.

A number of syndicates and companies that had subscribed to the policies in issue did not appear in response to the First Amended Complaint. In order to obtain jurisdiction over them, plaintiff served the director and otherwise complied with the requirements of ORS 746.320(3). None of those syndicates or companies appeared or otherwise participated in the case. The only Lloyd's entities that seek attorney fees actually appeared and defended the case, but each of them was served in a different fashion from that described in ORS 746.320(3).

The threshold issue on the cross-appeal is whether plaintiff served the appearing Lloyd's defendants "in the manner provided in ORS 746.320," as required by ORS 746.350. It is uncontroverted that plaintiff did not serve them in the manner provided in ORS 746.320(3). Instead, Lloyd's relies on ORS 746.320(5), which provides that nothing in ORS 746.320 "shall limit or abridge the right to serve any process upon an insurer in any other manner then permitted by law." In essence, Lloyd's interprets ORS 746.350 as authorizing an award of attorney fees any time a plaintiff serves an unauthorized insurer by any method that the law allows, not only by the specific method that ORS 746.320 creates.

■ We begin with the general proposition that the award of attorney fees by a court must be authorized by statute or contract. The problem with Lloyd's argument is that

ORS 746.350 is specific as to its grant of authority; it limits the award of attorney fees against an unauthorized insurer to when service of process is made "in the manner provided in ORS 746.320." Unless a method of service of process is made as provided under ORS 746.320, there is no authority to grant attorney fees under ORS 746.350.

ORS 746.320(5) does not provide for an alternative method of service under ORS 746.320; rather it constitutes a savings clause that ensures that the method of service that ORS 746.320(3) creates will not become the exclusive method for serving an unauthorized insurer. ORS 746.320(4), which describes the effect of service under ORS 746.320(3), makes that clear. That subsection provides that service of process "in the manner provided in this section" gives jurisdiction over the defendant if the plaintiff sends notice of the service to the insurer and files proof of having done so with the clerk of the court in the fashion that the subsection provides. Thus, for the purposes of ORS 746.320(4), service "in the manner provided in this section" means service only in the manner described in ORS 746.320(3). Moreover, the relevant portions of the two subsections were adopted at the same time as part of the same statute. Or Laws 1959, ch 323, §§ 2, 6. There is no reason to believe that the legislature intended the same phrase to have different meanings in different portions of the same statute. ORS 746.320(1) to (4), thus, provide only one method for serving an unauthorized insurer and describe the steps necessary to make that method of service effective.

In contrast to the preceding subsections, ORS 746.320(5) provides that the plaintiff may serve an unauthorized insurer "in any other manner then permitted by law." The word "other" in the statute, when understood in its context, necessarily means a method of service that is different from the method that the statute previously described—that is, it means "other than the manner provided in ORS 746.320." The fact that subsection (5) refers to other methods of service does not mean that it creates, otherwise provides for, or enacts those methods; it simply means that it recognizes their existence and affirms their validity. In sum, ORS 746.320 provides for only one method of service, and ORS 746.350 refers only to that method of service. We conclude, therefore, that ORS 746.350 did not authorize the trial court

to award attorney fees to Lloyd's, and, accordingly, the trial court did not err in refusing to grant them.

On appeal, reversed and remanded on plaintiff's duty to defend claim against defendants Transportation Insurance Company and Continental Casualty Company with instructions to grant plaintiff's motion for summary judgment and otherwise affirmed; affirmed on cross-appeal.