Argued and submitted March 10, decision of Court of Appeals
affirmed June 30, 2006

SCHNITZER INVESTMENT CORP.,
*Petitioner on Review,*

*v.*

CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON
and Certain London Market Insurance Companies,
The Insurance Company of the State Of Pennsylvania,
Transportation Insurance Company;
Continental Casualty Company;
Insurance Company of North America;
and Phoenix Insurance Company,
*Respondents on Review.*

(CC 9902-02004; CA A116662; SC S52122)

137 P3d 1282

Charles F. Hinkle, Stoel Rives, LLP, Portland, argued the cause and filed the brief for petitioner on review. With him on the brief was Joan P. Snyder.

I. Franklin Hunsaker, Portland, argued the cause and filed the briefs for respondents on review Certain Underwriters at Lloyd's of London and Certain London Market Insurance Companies. With him on the briefs were Paul J. Killion and Bruce J. Rome, Duane Morris LLP, San Francisco.

Peter J. Mintzer, Cozen O'Connor, Seattle, filed the response and brief for respondent on review The Insurance Company of the State of Pennsylvania. With him on the brief were Thomas M. Jones and Helen A. Boyer.

David E. Prange, Abbott & Prange, PC, Portland, filed the response and brief for respondents on review Transportation Insurance Company and Continental Casualty Company. With him on the brief was Nicholas A. Nardi.

Peter R. Chamberlain, Bodyfelt, Mount, Stroup & Chamberlain, Portland, filed the response for respondent on review Insurance Company of North America. With him on the response was R. Lind Stapley, Soha & Lang, P.S., Seattle.

Timothy R. Volpert, Davis Wright Tremaine, LLP, Portland, filed the response for respondent on review Phoenix Insurance Company. With him on the response was Everett W. Jack, Jr.

William H. Walters, Miller Nash, LLP, Portland, filed the brief for *amici curiae* Northwest Natural Gas Company, ZRZ Realty Company, Zidell Remediation Funding Trust, Zidell Marine Corporation, and Tube Forgings of America, Inc.

With him on the brief was Gayle Patterson, attorney for Northwest Natural Gas Company.

KISTLER, J.

**KISTLER, J.**

Plaintiff owns property in Portland near the Willamette River. After the Oregon Department of Environmental Quality (DEQ) ordered plaintiff to clean up environmental contamination on its property, plaintiff brought this action seeking, among other things, indemnification from defendants for the costs that it had incurred in complying with DEQ's orders. The trial court granted defendants' summary judgment motion and entered judgment in their favor. Although the Court of Appeals disagreed with some aspects of the trial court's judgment, it upheld the trial court's ruling that defendants had no duty, under the terms of certain insurance policies that they had issued, to indemnify plaintiff. *Schnitzer Investment Corp. v. Certain Underwriters,* 197 Or App 147, 104 P3d 1162 (2005). We allowed plaintiff's petition for review to consider that issue and now affirm the Court of Appeals decision.

Plaintiff's property is environmentally contaminated as a result of industrial and chemical manufacturing. Most of the contaminants are in the soil, but the groundwater also contains some contamination above background levels.[1] Beginning in 1988, plaintiff and DEQ started investigating the extent of the contamination and the appropriate means to remedy it.

After notice, DEQ included plaintiff's property on a list of sites that needed further investigation or cleanup. DEQ divided the property into three parts, Units A, B, and C. In 1993 and 1995, DEQ issued Records of Decision directing plaintiff to remedy environmental contamination on Units A and C. DEQ determined that no remedial measures were necessary for Unit B.

Over the years, defendants have issued various comprehensive general liability policies to plaintiff. Some of those polices provided primary coverage; others were excess

---

[1] Because the chemical components of soil and groundwater vary, DEQ first determines the level of chemicals that occur naturally in the soil or groundwater (the background levels) and then measures whether chemicals or other contaminants exceed those background levels.

or umbrella policies. All the policies, however, contain essentially the same provision, which gives rise to this litigation. Defendants agreed to pay all sums "which the insured shall become legally obligated to pay as damages because of * * * property damage." The policies defined "property damage" as:

> "(1) physical injury to or destruction of tangible property which occurs during the policy period including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period[.]"[2]

Finally, the policies contained a number of exclusions from coverage, including an exclusion for property damage to "property owned or occupied by or rented to the insured[.]"

The terms of defendants' policies frame the issue in this case. Under the terms of those policies, defendants had no duty to indemnify plaintiff for the costs that it incurred because of contamination to its own property. That much follows from the "owned property" exclusion. Groundwater, however, is the property of the state. *See* ORS 537.110 (recognizing state ownership of water). Defendants do have a duty to indemnify plaintiff for the costs that plaintiff became "legally obligated to pay because of property damage" to the groundwater.

■     It follows from the terms of defendants' policies that this case presents two issues. The first issue is whether there was "property damage" to the groundwater—*i.e.*, whether physical damage (environmental contamination) had occurred to the groundwater during the policy period. The second issue is whether plaintiff was legally obligated to incur clean-up costs because of existing contamination to the groundwater. If it were, then defendants' policies required them to indemnify plaintiff for those costs.

---

[2] The policies define "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in * * * property damage neither expected nor intended from the standpoint of the insured."

On the first issue, defendants do not dispute, for the purposes of summary judgment, that the environmental contaminants on plaintiff's property resulted in some contamination, above background levels, to the groundwater during the policy period; that is, defendants assume that some "property damage" occurred to the groundwater during the policy period. The issue that this case turns on is the second one—whether plaintiff was "legally obligated" to incur certain costs because of property damage to the groundwater. On that issue, the 1993 and 1995 Records of Decision that DEQ issued define the scope of plaintiff's legal obligation.

■■ Unless an ambiguity exists, we determine the meaning of those Records of Decisions as a matter of law, based on those decisions only and without reference to extrinsic evidence. *See State v. Swain/Goldsmith*, 267 Or 527, 530, 517 P2d 684 (1974) (signed order, rather than judge's statements, controls). If the decision is ambiguous, we may look to the record before DEQ to help determine the decision's meaning. *See Bennett v. Bennett*, 208 Or 524, 529, 302 P2d 1019 (1956) (stating proposition). We begin with the terms of the 1995 Record of Decision directing plaintiff to remedy the contamination to Unit A of its property.[3]

The 1995 Record of Decision sets out the following findings. Unit A is approximately 3.4 acres. Except for the northeast corner, Unit A lies approximately 200 feet from the Willamette River and is not subject to seasonal flooding. Previous owners of that part of the property had manufactured pesticides and agricultural chemicals on it. They also had used it for a plate and structural steel warehouse.

As a result of those activities, the soil in Unit A contained various metals, organic chemicals, and pesticides that exceeded background levels. The metals, semi-volatile organic chemicals, and pesticides were concentrated in specific locations or "hot spots" around the property (primarily around the former pesticide plant and what had been a surface impoundment pond). Concentrations of volatile organic

---

[3] That decision is more favorable to plaintiff than the 1993 Record of Decision regarding Unit C. If, as the Court of Appeals held, the 1995 Record of Decision does not require defendants to indemnify plaintiff, then neither does the 1993 Record of Decision.

chemicals were "relatively low" but were not restricted "to a particular subsurface unit or location within Unit A."

In assessing the degree to which those pollutants were subject to migration, DEQ found that the "organic contaminants present, particularly the chlorinated pesticides and [carcinogenic polycyclic aromatic hydrocarbon] compounds[,] generally have low solubilities in water and absorb to soil." Consistently with that finding, DEQ determined that "[l]eaching of contaminants from the soil into the dissolved phase via infiltrating precipitation is not a significant contaminant transport mechanism * * *."

DEQ also determined that "[r]elatively low metals concentrations (both total and dissolved) were found in groundwater samples." None of the dissolved metal concentrations exceeded current federal maximum contaminant levels for safe drinking water. The same conclusion was true for volatile organic compounds. DEQ found low concentrations of those compounds and one chlorinated herbicide, all of which were below the current maximum contaminant levels. Finally, DEQ noted that concentrations of hydrogen sulfide gas exceeding 10 parts per million were measured at two well heads but that the "concentrations of sulfur species in groundwater have not been quantified."

Based on those findings, DEQ found that "Unit A poses no significant risk of adverse impact on the environment"—*i.e.*, DEQ did not find a significant risk of adverse impact on the groundwater. Rather, DEQ found that the environmental contamination posed risks to human health; specifically, it found that the risk to human health derived from "long-term direct contact with near-surface soil" to which the contaminants had bound. DEQ observed that "[t]he routes of exposure included soil ingestion, dermal contact, and inhalation of particulates." Applying certain risk factors, DEQ concluded that "Unit A soils pose a potential chronic risk from surficial contamination for children under an uncontrolled residential site usage scenario because of possible ingestion, inhalation and dermal absorption of soil contaminants."[4] It also found that certain levels of carcinogenic risk may occur from "surficial exposure to pesticides

---

[4] When DEQ issued its 1995 Record of Decision, plaintiff's property was unoccupied. Plaintiff, however, intended to develop it, and DEQ determined the risk of

and [carcinogenic polycyclic aromatic hydrocarbon compounds] * * * resulting from ingestion, dermal contact, and inhalation of soil."

Finally, DEQ noted that it had not considered whether hydrogen sulfide was migrating to the surface by way of the groundwater. It found that "[g]roundwater monitoring will be conducted as part of the selected remedy to evaluate the potential presence of hydrogen sulfide or other sulfur species."

In directing plaintiff to remedy the environmental contamination on Unit A, DEQ sought to determine the most cost-effective remedy in light of the magnitude of the risks that the contaminants on Unit A posed. After considering several possible remedies, DEQ directed plaintiff (1) to excavate the top four feet of any soil that contains specified levels of six chemical compounds; (2) to remove certain sludge, crushed drums, and an underground storage tank; (3) to use a soil cap[5] to prevent direct exposure to any residually contaminated soil and to prevent erosion and runoff of contaminated soil; and (4) to monitor hydrogen sulfide gas to ensure that "the objectives of long term [hydrogen sulfide] gas management are maintained." Finally, DEQ required plaintiff to monitor the groundwater for at least five years. DEQ suggested that, "[i]f groundwater quality has not been degraded [during that period]," no additional monitoring would be necessary.

In explaining why the remedial measures that it selected would protect human health and the environment, DEQ reasoned that excavation and removal of the soil "will significantly reduce the threat of exposure from ingestion, dermal contact, and inhalation of contaminants adhered to soil particulates." It also explained that

"[c]apping will significantly reduce the potential for reasonable exposures to contaminated soil by eliminating direct

contamination to both persons and the environment based on plaintiff's intended use of the property.

    [5] DEQ recognized that plaintiff proposed to develop the property. The proposed structures and parking lots would result in an "asphalt cap" over some residually contaminated soil.

exposure pathways, preventing erosion and runoff, and limiting infiltrations of water, thereby reducing the potential of contaminants to leach to groundwater."

Having considered the terms of the 1995 Record of Decision, we agree with both the trial court and the Court of Appeals that DEQ's decision did not require plaintiff to clean up existing contamination in the groundwater; DEQ found that the contamination on plaintiff's property did not pose a significant adverse risk to the environment. Rather, the decision required plaintiff to remove and cap the soil to prevent the health risks resulting from contact with environmental contamination in the soil—ingestion, inhalation, and dermal contact with the soil. That conclusion follows both from the specific risks that DEQ identified and from the measures that it required plaintiff to take to remedy those risks.

Plaintiff argues, however, that removing and capping the soil will benefit the groundwater. It points to DEQ's statement that capping the soil will "reduc[e] the potential of contaminants to leach [into the] groundwater" and also DEQ's requirement to monitor the groundwater to ensure that the groundwater quality does not worsen. The difficulty with plaintiff's argument is that, at most, those remarks reflect a concern about future harm to groundwater. As the Court of Appeals correctly recognized, however, the terms of defendants' policies require defendants to indemnify plaintiff only if DEQ's Records of Decision legally obligated plaintiff to remedy "property damage" to the groundwater, and defendants' policies define "property damage" as an injury that occurs during the policy period, not an injury that may occur in the future. Under the terms of the policies, defendants had no obligation to indemnify plaintiff for the costs that it incurred in complying with DEQ's orders.

On review, plaintiff advances essentially three contrary arguments. The first two are factual. Plaintiff notes that, when DEQ initially proposed listing plaintiff's property, and also at other points during the investigative stage, it directed plaintiff to determine whether it was necessary to clean up existing contamination to the groundwater. Plaintiff reasons from that premise that DEQ's final order required it to clean up existing contamination to the groundwater. In

investigating that issue, however, plaintiff's consultant, CH2M Hill, found that the groundwater contained low levels of volatile organic compounds, no semi-volatile compounds, and a trace amount of a herbicide. A later investigation revealed that none of those contaminants exceeded maximum contaminant levels. The fact that DEQ required plaintiff to investigate whether plaintiff needed to remedy existing groundwater contamination does not mean that DEQ later directed plaintiff to do so.

Plaintiff's other factual argument is based on an affidavit that the DEQ project manager, Gilles, provided plaintiff as part of this litigation. In that affidavit, Gilles explained that DEQ had ordered plaintiff to remove and cap the soil to prevent environmental contaminants from leaching into the groundwater. Not only does the affidavit focus on future harm to the groundwater, but plaintiff's reliance on Gilles's affidavit suffers from a more fundamental problem. The relevant document to determine whether DEQ required plaintiff to clean up the contamination on its property because of existing contamination to the groundwater is the DEQ decision and, if that decision is ambiguous, the record leading up to it. See Swain / Goldsmith, 267 Or at 530; Bennett, 208 Or at 529 (stating those propositions). Gilles's post-hoc explanation of what DEQ's decision meant is no more relevant to that determination than a legislator's subsequent statement concerning the meaning of a law. Cf. DeFazio v. WPPSS, 296 Or 550, 561, 679 P2d 1316 (1984) (later legislature's understanding not relevant to meaning of earlier enacted law).

Indeed, Gilles executed an earlier affidavit for one of defendants that is at odds with the affidavit that he executed for plaintiff.[6] The conflict between those two after-the-fact

---

[6] In the affidavit that he filed for one of defendants, Gilles averred:

"As project manager, I did not consider groundwater to be contaminated by hazardous substances at levels posing significant risk to human health or the environment. The risk assessments completed for Units A and C eliminated the groundwater pathway as one of potential concern. If the DEQ ever had significant concern for groundwater, we would have required cleanup alternatives for groundwater to be developed in the Feasibility Study. The removal of soil contamination at Units A and C, site grading, placement of a soil cap on the Site, and installation of a diversion and collection system were designed to clean up soil contamination and to minimize direct exposure of contaminants to humans."

explanations illustrates why neither affidavit provides a reliable basis for understanding what DEQ required in its 1993 and 1995 Records of Decision. Rather, the terms of those decisions control.

Plaintiff's third argument is a legal one. Plaintiff relies on *dictum* in *Wyoming Sawmills v. Transportation Ins. Co.*, 282 Or 401, 407, 578 P2d 1253 (1978), to argue that defendants' policies provide coverage. The *dictum* in that case assumed that the insured was legally obligated to incur costs because of property damage to a third person's property. *Id.* Given that assumption, this court suggested (but did not hold) that the insurer would have a duty to indemnify the insured both for the cost of repairing the damage to the third person's property and also for the cost of replacing the insured's property, which the policy otherwise would not have covered. *Id.* The assumption that underlies the *dictum* in *Wyoming Sawmills* is absent here. As we have explained, DEQ's Records of Decision did not "legally obligat[e]" plaintiff to clean up property damage to the groundwater. Accordingly, this case does not require us to decide whether we would follow the *dictum* in *Wyoming Sawmills*.

Plaintiff also cites cases from other jurisdictions in which an insured was legally obligated, as a result of pollution emanating from the insured's property, to remedy environmental contamination to a third person's property. *See, e.g., Bankers Trust Co. v. Hartford Acc. & Indem.*, 518 F Supp 371, *vacated on other grounds*, 621 F Supp 685 (SDNY 1981). In those cases, the courts required the insurer, despite the owned-property exclusion, to pay both for the cost of cleaning up the third person's property and for at least some part of the cost of cleaning up the source of the pollution on the insured's property. *Id.* Plaintiff's reliance on those cases suffers from the same problem that its reliance on *Wyoming Sawmills* does. The premise underlying all those cases—that the insured was legally obligated to clean up existing contamination to a third person's property—is absent here.[7] We

---

[7] Plaintiff also cites a few cases that have required insurers, on the basis of public policy rather than the terms of the insurance policy, to pay the cost of cleaning up environmental contamination on the insured's property to prevent the imminent contamination of neighboring properties. That is so even though no contamination of the neighboring properties had occurred. To the extent that plaintiff

agree with both the trial court and the Court of Appeals that defendants had no obligation under the terms of their policies to indemnify plaintiff for the costs of complying with DEQ's 1993 and 1995 Records of Decision.

Plaintiff advances a second, separate argument. It contends that, because the Court of Appeals held that defendants have a duty to pay plaintiff's defense costs, the Court of Appeals should have addressed an issue concerning certain "lost policies"—policies that plaintiff claims existed but that neither plaintiff nor defendants can find. Defendants respond that the question of which defendant pays plaintiff's defense costs presents only a question of contribution among defendants and is of no concern to plaintiff. Without some showing that the existing policies are insufficient to cover plaintiff's defense costs, a showing that plaintiff has not made, we agree with defendants that the issue is one for only them to raise. Because they did not do so, there was no need for the Court of Appeals to address that issue. The Court of Appeals correctly resolved the two issues that plaintiff pursues on review.

The decision of the Court of Appeals is affirmed.

---

relies on those cases, they are inconsistent with the definition of "property damage" in defendants' policies. That definition requires, at a minimum, existing damage to a third person's property and defines the obligation that defendants owe plaintiff.