**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANDERSON BROTHERS, INC., an
Oregon corporation,
*Plaintiff-Appellee*,

STATE OF OREGON,
*Intervenor-Appellee*,

v.

ST. PAUL FIRE AND MARINE
INSURANCE COMPANY, a Minnesota
Insurance Company,
*Defendant-Appellant*.

No. 12-35346

D.C. No.
3:11-cv-00137-
MO

ANDERSON BROTHERS, INC., an
Oregon corporation,
*Plaintiff-Appellee*,

STATE OF OREGON,
*Intervenor-Appellee*,

v.

ST. PAUL FIRE AND MARINE
INSURANCE COMPANY, a Minnesota
Insurance Company,
*Defendant-Appellant*.

No. 12-35454

D.C. No.
3:11-cv-00137-
MO

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael W. Mosman, District Judge, Presiding

Argued and Submitted
May 9, 2013—Portland, Oregon

Filed August 30, 2013

Before: Alex Kozinski, Chief Judge, and Stephen
Reinhardt, and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Reinhardt

## SUMMARY[*]

### CERCLA / Insurance Law

The panel affirmed the district court's judgment in favor
of an insured, holding that the insurer breached its duty to
defend when it refused to provide a defense after the insured
received letters from the Environmental Protection Agency,
notifying the insured of its potential liability under the
Comprehensive Environmental Response, Compensation, and
Liability Act for environmental contamination of the Portland
Harbor Superfund Site.

The Environmental Protection Agency sent two letters to
the insured:  a letter issued pursuant to Section 104(e) of

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

CERCLA requiring the insured to respond to questions that necessarily established its liability under CERCLA; and a General Notice Letter identifying the insured as a potentially responsible party. The panel held that both the 104(e) Letter and the General Notice Letter were "suits" under Oregon law within the meaning of the policies' duty to defend. The panel also held that the letters alleged facts sufficient to alert the insured to its potential liability for environmental contamination under CERCLA. The panel held that the insurer breached its duty to defend, and affirmed the attorney's fee award in the insured's favor.

## COUNSEL

Seth Row (argued), Parsons, Farnell, & Grein, LLP, Portland, Oregon, for Plaintiff-Appellee Anderson Brothers, Inc.

David B. Thompson (argued), Senior Assistant Attorney General, Salem, Oregon, for Intervenor-Appellee State of Oregon.

Thomas A. Gordon (argued) and Andrew Moses, Gordon & Polscer, LLC, Portland, Oregon, for Defendant-Appellant St. Paul Fire and Marine Insurance Company.

Laura A. Foggan, Wiley Rein LLP, Washington, D.C., for Amicus Curiae Complex Insurance Claims Litigation Association.

**OPINION**

REINHARDT, Circuit Judge:

The Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA"), establishes a retroactive strict liability regime that imposes joint and several liability upon past and current landowners or operators of properties or facilities from which hazardous substances have been released or disposed into the environment. Plaintiff-Appellee Anderson Brothers, Inc., ("Anderson") received two letters from the Environmental Protection Agency ("EPA") notifying Anderson of its potential liability under CERCLA for environmental contamination of the Portland Harbor Superfund Site. The first letter required Anderson to submit an extremely detailed response to a questionnaire about its activities at its properties, under threat of severe civil penalties. The questionnaire required Anderson to respond to questions that necessarily established its liability under CERCLA. The second formally identified Anderson as a potentially responsible party ("PRP") and "encourage[d]" it to participate in settlement negotiations with other PRPs.

Anderson's general liability insurer, Defendant-Appellant St. Paul Fire and Marine Insurance Co. ("St. Paul"), declined to provide Anderson with a legal defense. Under the comprehensive general liability policies in question, St. Paul has a duty to defend Anderson against "suits" for activities covered by the comprehensive general liability policies. St. Paul did not consider the letters sent to Anderson to be "suits" because they were not filed in a court of law. In light of CERCLA's unique liability regime, which is designed to

promote settlement with the EPA instead of litigation, the district court held that both letters were "suits."

We affirm.

# I

Anderson is an Oregon corporation that owned and leased property, falling within the boundaries of the Portland Harbor Federal Superfund Site ("the Site"). St. Paul issued two comprehensive general liability policies ("the Policies") to Anderson,[1] providing coverage for damages arising from "occurrences" that happened between January 1979–80 and January 1980–81, respectively. St. Paul's relevant obligations under the Policies, which include a duty to defend Anderson, are as follows:

> The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of: . . . property damage to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any *suit* against the Insured seeking damages on account of such . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement *of any claim or suit* as it deems expedient . . . .

(Emphasis added.)

---

[1] St. Paul also issued additional policies to Anderson and to another corporate entity owned by Anderson. Those policies are not at issue here.

The EPA listed the Site as a "Superfund" site in December 2000.[2]  *See* 65 Fed. Reg. 75179, 75182 (Dec. 1, 2000).  On or around January 18, 2008, Anderson received a letter from the EPA, issued pursuant to Section 104(e) of CERCLA, 42 U.S.C. § 9604(e) ("the 104(e) Letter").  The 104(e) Letter stated that the EPA "seeks [Anderson's] cooperation" in its investigation of the release of hazardous substances at the Site, and explained that EPA was seeking information from "current and past landowners, tenants, and other entities believed to have information about activities that may have resulted in releases or potential threats of releases of hazardous substances to the Site."  The 104(e) Letter enclosed an extensive 82-question "Information Request" seeking, *inter alia*: information about Anderson's ownership of and operations at any property within the Site; specific physical, environmental, and structural descriptions of each property Anderson leased or owned within the Site; and detailed descriptions of Anderson's current and former activities at the Site, including its use of drainage and sewage lines, its handling and disposal of any hazardous substances and soils, and its use of groundwater.  The 104(e) Letter also informed Anderson that "[w]hile EPA seeks your voluntary cooperation . . . compliance with the Information Request is required by law" and failure to respond could result in an enforcement action and civil penalties of $32,500 per day of noncompliance.

---

[2]  "Superfund site" is a colloquial term used to refer to sites listed by the EPA on the National Priorities List (or "Superfund list") as part of the National Contingency Plan for the Removal of Oil and Hazardous Substances, pursuant to section 105 of CERCLA, 42 U.S.C. § 9605.  *See Pakootas v. Teck Cominco Metals, Ltd.*, 646 F.3d 1214, 1216 (9th Cir. 2011).  Superfund sites are sites believed by the EPA to be amongst the most contaminated in the nation or those most urgently requiring further investigation or remediation.

Anderson tendered the 104(e) Letter to St. Paul, and requested that St. Paul provide a legal defense and indemnity pursuant to its contractual duty to defend. St. Paul declined to provide a defense.

In November 2009, Anderson received a second letter from the EPA entitled "General Notice Letter for the Portland Harbor Superfund Site" ("the General Notice Letter"). The General Notice Letter explained that under sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606–9607, parties identified by the EPA as PRPs may be required to take action to clean up environmental contamination as ordered by the EPA, to reimburse the EPA for its own expenditures in cleaning up the Site, and to pay damages for any harm to natural resources caused by contamination at the Site. It continued:

> EPA has evaluated information in connection with the investigation of the Site performed to date and believes that Anderson Brothers, Inc. and Specialty Truck Parts[3] may be a PRP with respect to the Site. . . . EPA has reason to believe that hazardous substances have been or are being released from the facility(ies) located at [properties owned and leased by Anderson] in Portland, Oregon, into the 'study area' for [the Site] . . . .

The General Notice Letter also "encourage[d] communication between [Anderson], other PRPs, and EPA" and enclosed a list "of PRPs identified to date for the Site." The letter urged Anderson to communicate with a

---

[3] Specialty Truck Parts was a corporation acquired by Anderson in 1973 and dissolved in 1992.

"Convening Group" in which "PRPs work together to allocate the cleanup costs and work through intra-party issues to prepare for future negotiations with EPA for performance of the cleanup and reimbursement of response costs after EPA has issued its Record of Decision for the [Site.]" Participation in the Convening Group "will avoid litigation and significant transaction costs to you and your company." The General Notice Letter was a form letter, identical to the one sent out to all PRPs at the Site.

Anderson tendered the General Notice letter to St. Paul, again requesting that St. Paul provide a legal defense under its contractual duty to defend. St. Paul again refused to provide a defense.

## II

Anderson sued St. Paul in district court, alleging that St. Paul breached its duty to defend under the Policies by refusing to provide Anderson with a legal defense in response to each of the two letters. After the parties filed cross-motions for summary judgment, the State of Oregon intervened on Anderson's behalf in order to defend the constitutionality of the Oregon Environmental Cleanup Assistance Act, which provides a legislatively-imposed definition of "suit" in comprehensive general liability policies, as discussed below.

The district judge granted Anderson's motion for partial summary judgment from the bench, concluding that both letters triggered St. Paul's duty to defend. The parties stipulated to the resulting damages in order to obtain a final judgment. St. Paul appealed.

Anderson then moved for attorney's fees pursuant to Or. Rev. Stat. § 742.061.  The district court granted Anderson's motion in part, awarding slightly less fees than it had requested.  St. Paul filed a timely notice of appeal of the attorney's fee award, acknowledging that the award should be reversed only in the event that this court were to reverse the district court's judgment on the merits.  We consolidated the appeals.

### III

The primary question before us is whether the 104(e) Letter and the General Notice Letter are "suits" under Oregon law within the meaning of the Policies' duty to defend.  If either letter was a "suit," St. Paul had a duty to defend Anderson, although that duty would be invoked later if only the second letter caused it to commence.  Otherwise, St. Paul acted within its rights in refusing to provide Anderson with a defense.

### A

The Policies here are standard-form comprehensive general liability policies.  *See* Susan J. Miller & Philip Lefebvre, 1 *Miller's Standard Insurance Policies Annotated* 421.5 (2013 Supp.) (replicating the 1973 standard form comprehensive general liability policy that was in use when the Policies were issued).  Identical policies were issued by insurers nationwide at the time the Policies were purchased.  Because the EPA is engaged in Superfund remediation projects across the nation, it comes as no surprise that the question whether a letter from the EPA initiating proceedings under CERCLA constitutes a "suit" has been widely litigated.

This question has divided state courts as well as federal courts applying contract law of the several states.

Although the legal question here is one of state contract law, the nature of the federal CERCLA regime is relevant to the contractual interpretation issues. CERCLA imposes strict liability on all entities that have owned or operated "facilities"[4] at which hazardous substances were "disposed." *See Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 870 (9th Cir. 2001) (en banc); *see also* 42 U.S.C. §§ 6903, 9601(29) (defining "disposal"). The current owner of any facility at the time of cleanup is also strictly liable for any "release" of hazardous substances from the facility, *see* 42 U.S.C. § 9601(22) (defining "release" broadly), unless the owner satisfies the "narrowly applicable" "innocent landowner" defense, *Carson Harbor*, 270 F.3d at 883; *see* 42 U.S.C. §§ 9601(35), 9607(a)–(b).

"Once an entity is identified as a PRP," the EPA has broad authority to compel it "to clean up a contaminated area or reimburse the Government for its past and future response costs." *Burlington Northern & Sante Fe Ry. Co. v. United States*, 556 U.S. 599, 609 (2009); *see also Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066, 1072–73 (9th Cir. 2006) (summarizing the various tools at the EPA's disposal to arrange for a contaminated site to be cleaned up at PRPs' ultimate expense). A PRP's failure to cooperate with any reasonable order from the EPA at a contaminated site can result in significant civil liability. *See Pakootas*, 452 P.3d at 1073. These broad powers give the EPA strong leverage to

---

[4]  Facility is defined so broadly as to include almost any property or structure from which hazardous substances are emitted. *See* 42 U.S.C. § 9601(9); *see also United States v. Bestfoods*, 524 U.S. 51, 56 (1998).

compel PRPs to settle.    Indeed, "encourag[ing] early settlement between [PRPs] and environmental regulators" is one of CERCLA's central purposes.  *California Dep't of Toxic Substances v. Hearthside Residential Corp.*, 613 F.3d 910, 915 (9th Cir. 2010); *see also* Interim Guidance, 53 Fed. Reg. at 5298.

It is vital for a PRP to participate in settlement talks at the earliest possible opportunity because "[n]on-settling PRPs may be held jointly and severally liable for the entire amount of response costs minus the amount of the settlement." *United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1152 (9th Cir. 2010).    Furthermore, non-settling PRPs may not file a contribution action against settling PRPs "regarding matters addressed in the settlement."   42 U.S.C. § 9613(f)(2).   For this reason, the EPA sends general notice letters to PRPs "as early in the process as possible"; "[e]arly receipt of the general notice will ensure that PRPs have adequate knowledge of their potential liability as well as a realistic opportunity to participate in settlement negotiations." Interim Guidance, 53 Fed. Reg. at 5301.

In light of the effect on a PRP of failing to voluntarily participate in CERCLA settlement negotiations, it is perhaps not surprising that the "huge majority of U.S. courts hold that a policyholder's receipt of a PRP notice[5] from the U.S. EPA

---

[5] We refer to EPA's November 2009 letter as the General Notice Letter, because that is how it is captioned.  This court and other courts, however, have also referred to such letters as "PRP notices" or "PRP letters" because general notice letters are the EPA's method of advising an entity that it is a PRP.  *See* Interim Guidance, 53 Fed. Reg. at 5300. The terms are interchangeable.

. . . is the 'functional equivalent' of a 'suit.'" *Land O'Lakes, Inc. v. Employers Mut. Ins. Co. of Wis.*, 846 F. Supp. 2d 1007, 1020 (D. Minn. 2012) (quoting 2 Tod Zuckerman & Mark Raskoff, *Environmental Insurance Litigation: Law and Practice* § 12:33 (2011)); *see also id.* at nn.16–17 (collecting 11 state supreme court decisions holding that PRP letters trigger "suits" and 3 state supreme courts holding to the contrary). Indeed, this court was one of the first courts to adopt that now-majority view. *See Aetna Cas. & Sur. Co. v. Pintlar Corp.*, 948 F.2d 1507, 1516, 1517 (9th Cir. 1991) (applying Idaho law).

In *Pintlar*, we held, under Idaho contract law, that a PRP notice "is the effective commencement of a 'suit' necessitating a legal defense." *Id.* We explained that once the EPA has identified a possible PRP, "[i]n order to influence the nature and costs of the environmental studies and cleanup measures, the PRP must get involved from the outset." *Id.* Failure to cooperate with any requests by the EPA "may expose the insured, and potentially its insurers, to much greater liability, including the EPA's litigation costs." *Id*. Accordingly, we held that insurance coverage "should not

---

Almost all of the cases addressing whether a communication from the EPA is a "suit" have dealt with general notice letters rather than 104(e) letters. This is likely because the EPA often sends the two letters simultaneously. *See* Interim Guidance on Notice Letters, Negotiations, and Information Exchange, 53 Fed. Reg. 5298, 5300 (Feb. 23, 1988) ("Interim Guidance"). At the Site, however, the EPA's practice appears, at least in many instances, to have been to send 104(e) Letters to property owners within the Site prior to sending General Notice Letters. *See, e.g.*, *Century Indemnity Co. v. Marine Group, LLC*, 848 F. Supp. 2d 1238, 1244–45 (D. Or. 2012) (PRP received General Notice Letter two years after receiving 104(e) Letter).

depend on whether the EPA may choose to proceed with its administrative remedies or go directly to litigation." *Id.*

With these observations in mind, we turn to the immediate questions before us, i.e. whether there is any reason to reach a different result under Oregon law than the one we reached in *Pintlar*, and, if so, whether the same conclusion is justified with respect to the 104(e) Letter as well.[6]

## B

In 1999, the Oregon legislature enacted the Oregon Environmental Cleanup Assistance Act, Or. Rev. Stat. §§ 465.475–465.480 ("OECAA").[7]   OECAA provides a definition for the term "suit," and instructs courts to apply that definition when interpreting comprehensive general liability policies in cases involving administrative actions by the EPA.  OECAA defines "suit" as follows:

> Any action or agreement by the . . . [EPA] against or with an insured in which . . . the

---

[6]  Aside from contending that *Pintlar* has no bearing on this case because it applies Idaho contract law, St. Paul also argues that *Pintlar* is factually distinct because the insured in *Pintlar* had received further communications after receiving a General Notice Letter and had agreed to perform a remedial study.  We disagree.  *Pintlar* clearly held that the duty to defend was triggered *by the General Notice Letter*, not by any subsequent communications between Pintlar and the EPA.  *See Pintlar*, 948 F.2d at 1517 ("[A]n 'ordinary person' would believe *that the receipt of a PRP notice is the effective commencement of a 'suit'* necessitating legal defense." (emphasis added)).

[7]  OECAA was amended in ways not relevant here on June 10, 2013. *See* 2013 Or. Laws. Ch. 350 (2013).

> [EPA] in writing directs, requests or agrees that an insured take action with respect to contamination within the State of Oregon is equivalent to a suit or lawsuit as those terms are used in any general liability insurance policy.

Or. Rev. Stat. § 465.480(2)(b).  OECAA's "savings clause," states that the definition of "suit" applies unless the intent of the parties is shown to be contrary to the definition provided by the statute.    Or. Rev. Stat. § 465.480(8).    Because OECAA's statutory definition of "suit" does not apply if that definition is contrary to the parties' intent, we first determine whether the Policies demonstrate the parties' intended meaning of "suit," and whether any such intent is contrary to the OECAA definition.

How to determine the meaning of a disputed term in a particular insurance policy is a question of state law.  Like most states, Oregon determines the intent of parties to an insurance contract by looking first to the plain meaning of any disputed terms and then to the structure and context of the policy as a whole.  *See Gonzales v. Farmers Ins. Co. of Or.*, 196 P.3d 1, 3 (Or. 2008); *Hoffman Constr. Co. of Alaska v. Fred S. James & Co.*, 836 P.2d 703, 706–07 (Or. 1992). If the parties' intent cannot be determined by doing so, the policy is construed against the insurer, because "any reasonable doubt as to the intended meaning of [an ambiguous] term will be resolved against the insurance company and in favor of extending coverage to the insured." *N. Pac. Ins. Co. v. Hamilton*, 22 P.3d 739, 742 (Or. 2001) (quotation marks omitted); *accord Hoffman*, 836 P.2d at 707.

Fortunately, our task is made relatively simple by two decisions of Oregon's intermediate appellate court that hold the term "suit" ambiguous as used in comprehensive general liability policies not materially distinguishable from the ones at issue here. *See Underwriters at Lloyd's London & Excess Ins. Co. v. Mass. Bonding & Ins. Co.*, 230 P.3d 103 (Or. Ct. App. 2010), *rev. denied*, 243 P.3d 468 (Or. 2010); *Schnitzer Inv. Corp. v. Certain Underwriters at Lloyd's of London*, 104 P.3d 1162 (Or. Ct. App. 2005), *aff'd on other grounds*, 137 P.3d 1282 (Or. 2006).[8]

Although *one* definition of "suit" is that the term refers to a lawsuit, *Schnitzer* recognized that "[o]ne of the ordinary meanings of the word 'suit' is 'the attempt to gain an end by any legal process.'" 104 P.3d at 1168 (quoting *Webster's Third New International Dictionary* 2286 (unabridged ed. 2002)); *see also School Dist. No. 1, Multnomah Cnty. v. Mission Ins. Co.*, 650 P.2d 929, 937 (Or. Ct. App. 1982) (using the latter definition and referring to the 1976 edition of *Webster's New International Dictionary*).  Presumably because Oregon courts are obligated to interpret a policy in the policyholder's favor when neither the plain language nor the structure and content of the policy evince any specific intended meaning by the parties, *Schnitzer* relied on the broader meaning of "suit."  104 P.3d at 1168–69.  Applying

---

[8] Even though *Schnitzer* and *Massachusetts Bonding* were both decided after OECAA was passed, neither applied OECAA's definition of "suit." In *Schnitzer*, the insured demanded a defense in 1991, almost a decade before OECAA's enactment, so the court did not apply the statute. 104 P.3d at 1168 n.5.  In *Massachusetts Bonding* the court relied on *Schnitzer* and *St. Paul Fire & Marine Ins. Co. v. McCormick & Baxter Creosoting Co.*, 870 P.2d 260 (Or. Ct. App. 1994), rather than OECAA, although it did state in a footnote, which was dicta, that OECAA "codified" *McCormick & Baxter*.  230 P.3d at 116–17 & n.13.

that definition, *Schnitzer* held that the policyholder had been subjected to an environmental "suit" because communications between itself and Oregon's Department of Environmental Quality "described the factual basis on which [the agency] sought to hold plaintiff liable for the cost of the environmental cleanup." 104 P.3d at 1169.

*Massachusetts Bonding* reaffirmed *Schnitzer*, holding that

> [l]ike the policies at issue in *Schnitzer Investment Corp.* and *McCormick & Baxter Creosoting*, the policies here do not define "suit." Nor are we persuaded that any of the other terms of the policies provide sufficiently clear contextual guidance regarding the parties' intended meaning. Accordingly, we see no reason to reach a different interpretation of the term "suit" than we reached in our previous cases.

230 P.3d at 117.

The teaching of *Massachusetts Bonding* and *Schnitzer* is that under Oregon law, at least in environmental cases, the word "suit" is ordinarily ambiguous. Therefore, such a policy necessarily does not demonstrate any intent of the parties that would be contrary to OECAA's statutory definition of the term. We see no reason to believe that the Oregon Supreme

Court would hold otherwise.**⁹**    Accordingly, we apply OECAA's definition of "suit" here.**¹⁰**

St. Paul offers two arguments against our applying OECAA's definition of "suit." Neither is persuasive. First, St. Paul argues that the two letters at issue here are less coercive than the communications in *Schnitzer* and *Massachusetts Bonding*, and, therefore, they do not fit within the range of permissible meanings of the term "suit" developed in those cases. This argument misses the point of *Schnitzer* and *Massachusetts Bonding*. As we explained, these two cases establish that the term "suit" is ambiguous and can reasonably be interpreted to include any "attempt to gain an end by any legal process." *Schnitzer*, 104 P.3d at 1168. The communications from Oregon's Department of Environmental Quality were not interpreted as triggering "suits" because of their particularly coercive nature, but, rather, because they initiated the legal process provided under Oregon law for compelling a landowner to either clean up a

---

**⁹** When, as here, Oregon Supreme Court decisions do not resolve the question before us we "follow the decisions of the state's intermediate appellate courts where there is no convincing evidence that the state supreme court would decide differently." *Bills v. United States Fidelity & Guar. Co.*, 280 F.3d 1231, 1234 n.1 (9th Cir. 2002). Were the Oregon Supreme Court to conclude that the word "suit" has the narrow plain meaning proposed by St. Paul it would join the increasingly isolated minority of states that adhere to that view. *See, e.g.*, *Johnson Controls, Inc. v. Employers Ins. of Waussau*, 665 N.W.2d 257 (Wis. 2003) (overruling its prior holding that "suit" only means a lawsuit filed in court).

**¹⁰** There is no evidence aside from the standard-form Policies illuminating Anderson and St. Paul's intent with regard to the meaning of "suit"—and certainly no evidence of intent contrary to the OECAA definition of that term.

hazardous waste site or pay for others to undertake clean-up efforts. *See Schnitzer*, 104 P.3d at 1168–69; *see also McCormick & Baxter*, 870 P.2d at 266 (holding that a suit was triggered where communications established the agency's view that "[u]nder the statutes governing cleanup of environmental damage, [the insured] was going to have to pay").

Similarly, both the 104(e) Letter and the General Notice Letter at issue here were attempts by EPA "to gain an end by a[] legal process" and, therefore, were within the scope of ambiguity of the term "suit." The 104(e) letter compelled Anderson to respond to an intrusive questionnaire the answers to which exposed it to extensive liability—plainly an end obtained through legal process. As to the General Notice Letter, by specifically alleging that "EPA has reason to believe that hazardous substances have been or are being released" and "encourag[ing]" Anderson to communicate with "other PRPs" in order to "avoid litigation and significant transaction costs," it left little doubt that EPA was seeking to obtain Anderson's cooperation through the legal process of identifying Anderson as a PRP.[11]  In light of the unique role

---

[11]  This unambiguous language, which directly accuses Anderson of owning property from which hazardous substances are being released, demonstrates the error of St. Paul's argument that the General Notice Letter does not really accuse Anderson of being a PRP.  St. Paul emphasizes the General Notice Letter's statement that Anderson "*may* be a PRP with respect to this Site." (Emphasis added.) In context, the EPA's use of the word "may" does not suggest any actual doubt by the EPA as to whether Anderson is liable under CERCLA, but rather that the issue has not yet been adjudicated by a neutral party.  Furthermore, the EPA has stated that the language used in the General Notice Letter was generic language used in *every* general notice letter sent by the EPA to PRPs at the Site. *See also Century Indemnity*, 848 F. Supp. 2d at 1245 (describing another General Notice Letter at the Site using the same language).

settlement and coercive information demands play in CERCLA, there is little doubt that each letter was an attempt to gain an end through legal process.

Second, St. Paul points out that the Policies' duty to defend clauses distinguish between *suits* (which insurers must defend) and *claims* (which insurers may investigate and settle, but need not necessarily defend).  It argues that interpreting the letters at issue here as having triggered a "suit" effectively writes the word "claim" out of the policy because, in St. Paul's view, the letters at issue here are, at most, demand letters, and the word "claim" refers to pre-litigation communications such as demand letters. *See, e.g.*, *Foster-Gardner, Inc. v. Nat. Union Fire Ins. Co.*, 959 P.2d 265, 280–81 (Cal. 1998) (accepting this argument under California law); *Lapham-Hickey Steel Corp. v. Protection Mut. Ins. Co.*, 655 N.E. 2d 842, 847 (Ill. 1995) (same under Illinois law).

We agree with St. Paul that a "claim" can include any communication that is "a demand of a right or supposed right" or "a demand for compensation, benefits, or payment," *Webster's Third International Dictionary* 414 (1976 ed.), and therefore includes most demand letters sent by a third party to a policyholder.  St. Paul errs, however, when it suggests that classifying the two letters as "suits" rather than mere "claims" would render the term "claim" nugatory.  The letters here are not normal demand letters.  They are formal steps in a legal process administered by the EPA that inexorably leads to the EPA seeking to hold property owners strictly liable for environmental contamination.  Therefore, treating the letters as "suits" does not diminish the meaning of the term "claim" as it is used in the Policies; "claim" continues to refer to normal demand letters.

Unlike a normal demand letter, neither letter made a demand that Anderson was free to ignore. With respect to the General Notice Letter, as we explained in *Pintlar*:

> Unlike the garden variety demand letter, which only exposes one to a potential threat of future litigation, a PRP notice carries with it immediate and severe implications. Generally, a party asserting a claim can do nothing between the occurrence of the tort and the filing of the complaint that can adversely affect the insureds' rights. However, in a CERCLA case, the PRP's substantive rights and ultimate liability are affected from the start of the administrative process.

*Pintlar*, 948 F.2d at 1516. Similarly, Anderson could not disregard the 104(e) letter. That letter expressly warns Anderson that its failure to respond (or its submission of an "incomplete, ambiguous or evasive" response) could result in a fine of up to $32,500 *per day*. No "garden variety" demand letter that is a mere "claim" could impose such a requirement upon the recipient.[12]  Accordingly, the Policies' "claim or

---

[12] Our approach is in harmony with a number of state supreme courts that have also found that letters that might simply pass for demand letters (and therefore, mere "claims") in other contexts are "suits" in the context of a CERCLA claim. *See, e.g., R.T. Vanderbilt Co. v. Cont'l Cas. Co.*, 870 A.2d 1048, 1062–63 (Conn. 2005) ("[C]oncluding that a PRP letter constitutes a suit does not disturb the distinction between the terms suit and claim in the . . . comprehensive liability policies."); *Michigan Millers Mut. Ins. Co. v. Bronson Plating Co.*, 519 N.W. 2d 864, 871 n.13 (Mich. 1994), *overruled on other grounds by Wilkie v. Auto-Owners Ins. Co.*, 664 N.W. 2d 776 (Mich. 2003); *Coakley v. Maine Bonding & Cas. Co.*, 618 A.2d 777, 786 (N.H. 1992).

suit" language does not demand the narrow interpretation of "suit" that St. Paul urges.

## C

Having concluded that Anderson and St. Paul did not express an intent contrary to the OECAA definition, we now apply the OECAA definition to that term. Under Section 2(b) of OECAA, a particular communication between EPA and an insured entity is a "suit" if it is (1) an "action or agreement" by the EPA (2) that is "against or with" the insured (3) in which the EPA "in writing directs, requests or agrees" that the insured "take action" (4) and that such action be "with respect to contamination within the State of Oregon."[13] Or. Rev. Stat. § 465.480(2)(b). We analyze each element in turn.

First, the EPA's sending of each letter constituted "action." The word "action" has both an informal and a more formal, legalistic meaning. *See Webster's Third New International Dictionary* 21 (3d unabridged ed. 2002); *see also Black's Law Dictionary* 31 (8th ed. 2004). It is clear that the Oregon legislature intended that, in the context of OECAA, the term "action" have its less formal definition. Section 2(b) refers to "actions or agreements" in which the EPA "directs, *requests* or agrees" that the insured entity take action. Or. Rev. Stat. § 465.480(2)(b) (emphasis added). A formal legal proceeding would not result in a "request" by the

---

[13] We see no merit to St. Paul's argument that Section 1(a), which provides a definition of the terms "'suit' or 'lawsuit'" "*[a]s used in this section*," Or. Rev. Stat. § 465.480(1)(a) (emphasis added), is relevant. OECAA is perfectly clear that the definition of "suit" contained in Section 1(a) is the definition of the term *as used in the statute*, whereas Section 2(b) provides the definition that should be used to interpret the word "suit" *as used in general liability insurance policies* such as the Policies here.

EPA that the insured act in a particular fashion.  The statute's use of the verb "request" makes sense only if "action" has its less legalistic meaning.  In addition, the use of the term "action" elsewhere in the statute proves that "action" does not mean "formal legal proceeding."    Section 465.480(1)(a) expressly treats as separate categories "formal judicial proceedings" and "administrative proceedings and *actions* taken . . . under federal law." (emphasis added).  Thus, we construe the term "action" broadly in § 465.480(2)(b) as well.  Applying a broad definition of "action," we have no trouble concluding that the EPA's sending of both the 104(e) Letter and the General Notice were "actions."

Second, both letters are actions by the EPA "against" Anderson.  "Against" means "in opposition or hostility to.*"  Webster's Third New International Dictionary* 39 (3d unabridged ed. 2002).  There is no question that each letter is hostile to Anderson and in opposition to its interests.

Third, each letter also "directs" or "requests" that Anderson "take action." While one might dispute whether the letters "direct" that Anderson do anything, there is no question that they "request" that it do so.  The 104(e) Letter is explicit: "[Y]ou are hereby *requested* to respond to the Information Request attached to this letter."    (Emphasis added.)    The General Notice Letter is slightly more circumspect; it "encourage[s]" Anderson to contact other PRPs to participate in settlement discussions.  Nonetheless, the EPA's not-so-veiled threat that participation in the convening group is necessary to "avoid litigation and significant transaction costs to you and your company" leaves little question that the General Notice Letter is (at least) a request that Anderson take action.  *See Pintlar*, 948 F.2d at 1517 (noting that "[l]ack of cooperation" with a PRP letter

"may expose the insured, and potentially its insurers, to much greater liability, including the EPA's litigation costs").

Fourth, the actions requested by the EPA in the two letters are plainly "with respect to contamination in the State of Oregon." They concern nothing *but* contamination at the Site, Anderson's potential liability for such contamination, and EPA's efforts to clean up the contamination.

Accordingly, we hold that both the 104(e) Letter and the General Notice Letter constitute "suits" within the meaning of OECAA.

## D

Finally, St. Paul argues that applying OECAA's definition of "suit" would violate the Contracts Clauses of the United States and Oregon Constitutions because the statutory definition would alter its contractual commitments under the Policies. As we have stated, however, under Oregon common law, if a contractual term is found to be ambiguous, it is generally interpreted against the insurer. *See Hamilton*, 22 P.3d at 742; *Hoffman,* 836 P.2d at 707. Because OECAA's definition of "suit" applies only when the parties did not have any intent with respect to the meaning of the word "suit," (or when their expressed intent was not contrary to the OECAA definition), we reject St. Paul's argument that OECAA, as applied, violates the United States and Oregon Constitutions' Contracts Clauses. Absent OECAA, we would simply construe the Policies against St. Paul as required by Oregon common law. This explains why the *Massachusetts Bonding* court suggested that OECAA merely "codified" for environmental cases the broad common law definition of "suit" that Oregon courts had previously adopted in

construing insurance contracts.   230 P.3d at 117 n.13. Therefore, St. Paul's rights under the Policies are not diminished by our resort to OECAA's definition of "suit."

## IV

Alternatively, St. Paul argues that even if the letters are "suits," neither triggered the duty to defend because they do not allege conduct covered under the Policies.  St. Paul's argument is based on the fact that neither letter specifically demands that Anderson pay compensation for the release of hazardous substances from its property.  St. Paul's factual observation is true, but its legal conclusion does not follow.

There is no requirement under Oregon law that a suit against a policyholder contain a demand for specific damages in order to trigger the duty to defend.  It is sufficient that the suit contain allegations that, if proven, "could impose liability for the conduct covered by the policies[.]" *Massachusetts Bonding*, 230 P.3d at 116.  In determining whether a suit alleges conduct covered by the policy "[t]he insurer has a duty to defend if the complaint provides *any basis* for which the insurer provides coverage" and any ambiguities in the scope of coverage must be resolved in the insured's favor. *Ledford v. Gutoski*, 877 P.2d 80, 83 (Or. 1994) (emphasis in original).  The "analysis focuses on the *allegations* in the complaint rather than the claims identified in it." *Nat. Union Fire Ins. Co. of Pittsburgh Pa. v. Starplex Corp.*, 188 P.3d 332, 347 (Or. Ct. App. 2008) (quotation marks and alteration omitted) (emphasis in original).  Thus, St. Paul's argument that "[a]t no point do[] the [two letters] seek the payment of 'damages' for property damage or bodily injury" is of no avail.  The letters need only allege facts which, if proven, would ultimately render Anderson liable for CERCLA

damages.[14]  Here, interpreting any ambiguity in the letters in Anderson's favor, *see Ledford*, 877 P.2d at 83, both letters triggered the duty to defend.  Each letter put Anderson on notice of the EPA's belief that Anderson was responsible for the release or disposal of hazardous substances at the Site and of its intent to pursue compensation for Anderson's alleged role in such releases or disposals.  We therefore hold that both letters alleged conduct covered under the policies and, therefore, triggered St. Paul's duty to defend.

## CONCLUSION

We hold that both the 104(e) Letter and the General Notice Letter were "suits" within the meaning of the Policies.  In addition, the letters alleged facts sufficient to alert Anderson to its potential liability for environmental contamination under CERCLA.  We therefore hold that St. Paul breached its duty to defend Anderson.  We also affirm the attorney's fee award in Anderson's favor in light of our holding on the merits.

**AFFIRMED.**

---

[14] Significantly, St. Paul does *not* argue that the type of releases that the EPA alleges to have occurred at Anderson's properties would not be potentially covered under the policy.  *Cf. Schnitzer*, 104 P.3d at 1169 (insurer argued that the administrative documents in question alleged damage only to the insured's soil, which would not have been covered by the policy, instead of damage to the groundwater, which was covered by the policy).